# EXHIBIT 1

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | |
|---|---|
| PATENT: | 7,145,902 |
| DATE OF ISSUE: | December 5, 2006 |
| DATE OF FILING: | June 22, 2005 as a Divisional of an Application filed October 7, 1997 based on a foreign application filed on October 7, 1996 |
| PATENTEE: | Sigram Schindler et al. |
| TITLE | METHOD FOR TRANSMITTING DATA IN A TELECOMMUNICATIONS NETWORK AND SWITCH FOR IMPLEMENTING SAID METHOD. |

Mail Stop:  INTER PARTES REEXAMINATION
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**REQUEST FOR *INTER PARTES* REEXAMINATION**

*Inter Partes* reexamination under 35 U.S.C. §§ 311-318 and 37 CFR 1.913 of

United States Patent No. 7,145,902, "Method for Transmitting Data in a

Telecommunications Network and Switch for Implementing Said Method," which issued

on December 5, 2006, to Sigram Schindler et al. (the '902 patent), is respectfully

requested.  A copy of the '902 patent is included herewith as Exhibit 1.  The '902 patent

has not been deemed unenforceable.  This request is brought on behalf of Cisco Systems,

Inc., a Delaware Corporation ("Requestor").

**A.    CLAIMS FOR WHICH REEXAMINATION IS REQUESTED AND DISCLOSURE OF CONCURRENT LITIGATION**

*Inter Partes* reexamination of claims *36,* 37, 41, 54-58, 60-62, 64, 66, *68, 69,* 71,

75, *77,* 79, 82, *84,* 87, 90-91, *92,* 95, 98, *100*, 102, 104, *118*, and 119-125 of the '902

patent is respectfully requested. (The eight independent claims are italicized.) The claims are referred to herein as the challenged claims or the claims under reexamination.

Requestor has attached hereto as Exhibit 1, along with the '902 patent, a copy of the Certificate of Correction to the '902 patent (referring to cancelled claims 105-117), in accordance with 37 CFR § 915(b)(5).

The present request for reexamination arises in connection with the assertion of all the above claims of the '902 patent, except claims 118-125, against Requestor by the assignee of the '902 patent, Teles AG Informationstechnologien ("Teles"), in a district court action titled *Cisco Systems, Inc. v. Teles AG Informationstechnologien,* now pending in the United States District Court For The District of Columbia, Case No. 1:05-CV-02048 (RBW). The parties have exchanged initial discovery requests and responses regarding claim construction and infringement. A copy of Teles' Supplemental Response To Cisco's Interrogatory Nos. 1, 2, 3, 6, and 7 is attached as Exhibit 2.

The German applications from which the '902 patent claims priority issued as a German patent. However, the German patent and its EP counterpart patent were declared invalid in 2006 by the German patent court in nullity proceedings between the present parties. Copies of translations of the nullity opinions are attached hereto as Exhibits 3 and 4.[1] The claims of the German and EP patents were very similar to claims asserted in the '902 patent. Although the German court considered some of the references discussed below, it did not have the benefit of several of the additional references here, as these are prior art in the United States under 35 U.S.C. § 102(e).

---

[1] A list identifying the various references cited in the two German decisions is contained in Exhibit 32. The same prior art reference may have a different "NK" number in the two decisions.

### B.    BRIEF OVERVIEW

Requestor requests reexamination of the '902 patent in view of the prior art cited in the Information Disclosure Statement provided herewith as Exhibit 5. A complete copy of each reference is also provided as Exhibits 6, 7, 8, 9, 10, 29, and 31. These references render the challenged claims of the '902 patent unpatentable under both 35 U.S.C. § 102 and § 103. As detailed in the discussion and the claim charts submitted below, each and every element of the claims under reexamination is found in multiple references. Therefore, a substantial new question of patentability is raised by these references. Specific proposed rejections are identified in Section E below.

The nature of the claimed invention at issue here was described in the '902 patent as follows: "The invention relates to a method for transferring data from a first switch to a second switch, selectively by line switching or by packet switching, and to a switch for carrying out the method." '902 patent at Col. 1:19-22. More specifically, the Summary of the Invention states what the patentees understood the invention to be:

> "the present invention makes it possible during packet-switching connection between two switches to achieve a dynamic change-over to line-switching connection without interrupting the connection. … Through the establishment of a line-switching connection between the switches, a bypass is produced according to the invention on which data can be transferred with fixed bandwidth and slight time delays substantially in real time so that the data blockage [in the packet-switched connection] is bypassed."

'902 patent, Col. 3:25-28. The change-over may be initiated by the originating caller, or by a "network management system." The patent describes such a changeover occurring during various types of data communications, including telephony, and over various circuit-switched or packet-switched networks, such as the PSTN, the ISDN or the Internet. A representative claim is Claim 36 of the '902 patent, which reads:

36.    A method for transferring data selectively by line switching or by packet switching from a first switch to a second switch, the first switch being part of or having access to a line-switching network and a packet switching network, comprising:

a)    packetizing the data into data packets in the first switch if the data does not yet exist as data packets;

b)    transferring the data packets from the first switch through the packet-switching network to the second switch;

c)    checking whether a control signal exists for changing-over from the packet-switching data transfer of the data packets through the packet switching network to a line-switching data connection to the second switch, wherein the control signal is produced by a network management system;

d)    establishing the line-switching connection through the line-switching network to the second switch in response to said control signal, if the line-switching connection is not yet present; and

e)    changing-over from the packet-switching data transfer of the data packets through the packet switching network to a line-switching data transfer in response to said control signal and transferring data over the line switching connection to the second switch.

By the time of the alleged priority date of October 7, 1996, for the '902 claims, the ability to change-over a telecommunications connection, even an ongoing one, between a packet-switched connection and a line-switched connection was well known in the art. As described in more detail below, the prior art repeatedly describes the same issues/problems identified in the '902 patent, and discloses the same methods and structure for resolving those problems. The following are illustrative examples that will be described in more detail later:

*Farese, U.S. Patent No. 4,996,685 (Exhibit 9) at Abstract and Col. 11:66-12:5* (invention allowing a host computer "to dynamically change an ISDN access path … between a packet switched connection and a circuit switched connection … during the occurrence of the session ..." and "the host computer suitably instructs the Broker PC to change the communication channel during an on-going host session from circuit switched to packet switched as the communications needs of the host computer that occur during the host session change. This change occurs in a fashion that does not disrupt the host session and is substantially, if not totally, transparent to the user.");

*Focsaneanu, U.S. Patent No. 5,610,910 (Exhibit 6) at Abstract, Col. 4:31-33 & Figs. 8 and 13* (describing a new "access module" for telephony and data connections to the Internet and the PSTN: "The invention solves these problems by providing flexible and adaptable multiservice access to the networks. Customer requirements are checked by monitoring traffic on a local access at a connection request and/or during the established connection, and the local access is configured according to the transmission requirements." … "It is another object of the invention to provide a system which can perform an alternate routing of services among transport networks.");

*Jonas, U.S. Patent No. 6,137,792 (Exhibit 7) at Col. 1:7-10, 2:64-3:2 and Figure 1* ("This invention relates to a method and system for enabling data transmission over a bypass circuit-switched network between two computers connected to a public packet-switched network, such as the Internet …" "[T]here exists a need for a method and system to enable computer users communicating across the Internet to transmit at least a portion of the communication across a network having a low initial connection cost, such as a circuit-switched public phone network …");

LIBA/1819814.2

***Lucent Press Release of 9/17/96 (Exhibit 8)*** (describing a new IP telephony server: "the network management software will be able to transparently route traffic over either intra/Internet or the public network. If the Internet was too congested, for instance, the server could switch the transmission back to the public network."); and

***Matsukawa, U.S. Patent No. 5,598,411 (Exhibit 10) at Col. 6:52-57*** ("according to the present invention, when a fault is generated in the data communication by packet switching, or when a large amount of delay occurs in the transmission of data by packet switching, the data communication by packet switching is automatically changed to data communication by circuit switching").

In these references and in others discussed below, the prior art teaches the dynamic changing-over from packet-switching to line-switching, with the same purposes, structure and methods, not only between the packet-switched Internet and traditional circuit switched telephone networks, but also between other packet and circuit switched connections. The prior art itself repeatedly suggests various motivations for adopting this change-over, and even suggests that the concept of the mid-connection change-over can be implemented in various different networks. See, e.g., Farese, U.S. Patent No. 4,996,685 (Exhibit 9) at Col. 9:37-43 ("those skilled in the art will clearly realize that the teachings of the present invention can be readily applied to and incorporated within substantially any transmission network that can connect a host computer to a user through two or more separate communications connections that have different attributes …"). Moreover, the '902 patent itself acknowledges that the technologies used in the alleged '902 invention are not novel. '902 patent at col. 6:45 ("The technologies used are known per se."). The patent also admits that the structure of the claimed switch consists of

- 6 -

known elements and uses known switching protocols. See, e.g., '902 patent at col. 8:23-52. Indeed, identical structures for a switch that is capable of switching between packet and line-switched connections had already been disclosed in the prior art. See, e.g., Focsaneanu, US 5,610,910 (Exhibit 6) at Figures 8 and 13 (discussed in more detail below) and Matsukawa, US 5,598,411 (Exhibit 10) at Figure 1.

In short, for the reasons stated herein, the prior art raises substantial new questions of patentability that were not raised or discussed in the prosecution of the '902 patent. The Requestor accordingly asks that the challenged claims be reexamined and found invalid in light of the prior art discussed below.

## C.     BACKGROUND OF THE '902 PATENT

As indicated above, the '902 patent broadly claims a method and apparatus for transferring data from a first switch to a second switch selectively by line-switching or by packet-switching, as well as a switch for carrying out the method. According to the method, data packets are transferred from a first switch by packet-switching through a packet-switching network to the second switch. A control signal directs establishing a line-switching connection from the first switch to the second switch and the data are then transferred through this line-switching connection. See also '902 patent abstract.

According to the '902 patent, there are two basic different types of switching technologies: "The present-day situation in telecommunications is marked by a division between two different connecting and switching technologies. These are the synchronous line-switching technology (line-switching or circuit switching) and asynchronous packet-switching technology (packet-switching)." Col. 1:11-16. The alleged advantages of the inventions claimed in the '902 patent relate to the efficient use of low cost packet switching over the internet when the packet switched network is not congested, and when

the packet switched network is congested using the relatively high cost line switching network that will allow the required transfer rate. "Line-switching connections are expensive, particularly during telephone conversations since the costs accumulate irrespectively of the information actually transferred. The advantage of a line switching connection is that it is free of any time delay and has a fixed bandwidth." Col. 1:43-45. "With Internet telephony, a cost-conscious caller uses the normal Internet with approximately 8 kbit/s bandwidth and a time delay of 0.5 seconds. When the Internet is overloaded, the time delay of the individual packets becomes so great that an acceptable conversation connection between telephone partners is no longer possible." Col. 2:11-14.

The '902 patent states: "Based on the prior art, the present invention is concerned with the problem of providing a method for transferring data from a first switch to a second switch and providing a switching for carrying out the method which, depending on the data origin and headers of a user or network management system, allows flexible data transfer between the switches and more particularly cost-effective data transfer with real time properties. The solution according to the present invention makes it possible during packet-switching connection between two switches to achieve a dynamic change-over to line-switching connection without interrupting the connection." Col. 3:7-18.

The invention of the '902 patent is broadly described as a "switch" that has a packeting device for packeting and unpacketing data, an IP switching device for routing data packets, a line-switching device for establishing connections for switching through data channels and a control device which directs incoming data either to the IP switching device or to the line switching device depending on the control signals. Col. 3:41-47.[2]

---

[2] The '902 patent defines and describes the term "switch" broadly: " The term "switch" is used below so that it includes both a line switch of a line switching network and a packet switch of a packet switching

- 8 -

The specification discloses only one embodiment of the claimed switch. In FIG. 1 of the '902 patent, a telecommunications network according to the invention is shown with "switches" 7a and 7b according to the invention. A network containing several switches 7 and 7a is shown in FIG. 3. The switches 7a and 7b integrate the functions of a packet switch and a line switch. "The important factor is therefore the possibility of dynamically switching between packet-switching and line-switching during one transfer, [making it]… possible to change over, when desired, from an asynchronous packet-switching transfer of variable bandwidth to a synchronous line-switching transfer of greater and fixed bandwidth. Internet telephony and downloading of files from a WWW server are two important uses." Col. 7:13-26.

The only detailed diagram of the structure of the claimed switch is shown in FIG. 4 of the patent, reproduced here:



The switch 7 is described as being part of both a packet-switching network (e.g., the Internet) and a line-switching network (e.g., POTS or ISDN telephone network). Data

---

network." Col. 1:26:28. "A line switch, alias line switching equipment, is called telecommunications apparatus (TK apparatus) in the private sector, and exchanges of the network supplies in the public sector. A packet switch, alias packet switching apparatus, is also called a router, an IP switch or a host computer." Col. 1:29-33. "The term 'switch' is used in the sense of the present invention as already explained so that it includes both a line-switch of a line-switching network which copies over 1-byte packets, and a packet-switch (router) of a packet-switching network which copies over multi-byte packets. Data to be transferred can be any type of data, such as audio data, video data or computer files." Col. 3:30-36.

coming in through data input 74 can have any source, an IP switch/router, a line-switch such as an exchange point or a telecommunications unit, from a LAN or from an end terminal 1 or 2.  Col. 8:16-34.  The switch 7 has a line switching device 73 that has a digital coupling 731 which is known per se for switching through telephone conversation channels of the line-switching network, and a multiplex/demultiplex device 732 which produces sub-channels on existing data channels.  The patent admits that the structures of the switch in Figure 4 are "technologies [that are] known per se."  Col. 6:46; see also 8:35-53 ("[t]he switch 7 has a known IP switch 72" … the line switching device 73 "has a digital coupling 731 which is known per se").

The internal control commands, as to whether packet switching or line switching is to take place are produced in a control device 71. The specification  describes the control device 71 as a switch which forwards the incoming data either as data packets to the IP switch 72 or as bit flow to the line switching device 73.  The change-over control unit 711 monitors and controls which open connections are present (i.e., which and how many data channels are connected) and which bandwidth the individual data channels require.   The control device 71 has a change-over control unit 711, two packeting/unpacketing devices 713 and 714, and an intermediate register 712. The change-over control unit is connected to a topography data bank 75 which contains geographical data for a number of IP addresses.

If the incoming data are IP packets, then the headers of the IP packets are evaluated by the change-over control unit 711.  If the incoming data are a continuous data stream, then the signaling information of the signaling channel (in band signaling or outband signaling) are evaluated by the change-over control unit 711. The basic state

- 10 -

thereby provides that the incoming data are sent into the Internet through the IP switch 72. If the incoming data do not yet exist as IP packets then they are packeted into corresponding IP packets in the packeting/unpacketing device 714 and sent to the IP switch.

The claimed change over from packet switching data transmission to line-switching data transmission occurs after the establishment of a connection to a second switch or the destination end terminal over the packet network. To change from the packet switching transmission of the data over the connection in the packet network to line switching at the command of the control unit 71, a connection in the line-switching network is made via the line-switching unit 73 (bypass) with another switch (destination switch). In an ISDN network, the ISDN signaling command SETUP is sent to the next exchange point. After the line switched connection over the ISDN is established, the ongoing packet-switched transmission of data is terminated and all the incoming data of the communications connection considered are no longer directed through the IP-switch 72 but through the line-switching unit 73. The data are now transferred by line-switching with fixed bandwidth through the established bypass to the other switch. Col. 9:42-53.[3]

### D.    PROSECUTION OF THE '902 PATENT

The '902 patent issued December 5, 2006 from application number 11/165,280 filed June 22, 2005, which is a divisional of application number 09/147,970 filed October

---

[3] If the data exist as IP packets but are to be transferred line-switched through the line-switching device 73 then the data are, where applicable, unpacketed in the packeting/unpacketing device 713. More particularly the headers, of the data packets are removed. Unpacketing is optional however and not absolutely necessary since data packets can be transferred line-switched where applicable according to the PPP protocol. The (packeted or non-packeted) data are transferred as bit stream to the line switching device 73 by the change-over control unit 711. '902 patent at 8:46-9:22.

7, 1997 as application No. PCT/DE97/02363.[4]  Parent application number 09/147,970

issued as U.S. Patent No. 6,954,453 (the Schindler '453 patent) on October 11, 2005,

claiming foreign priority to German application No. DE196 42 063 filed October 7, 1996

and German application No. DE196 45 368 filed October 23, 1996.[5]

> **a.    Prosecution of the parent application**

During the prosecution of the '970 parent application, in the first Office Action

dated June 10, 2002 (Exhibit 11), the Examiner rejected the entire set of then-pending

claims based on anticipation by Arango U.S. Patent No. 5,732,078, which is one of the

references discussed in this request for  reexamination.  In response, by Amendment

dated December 12, 2002 (Exhibit 12), the Applicants cancelled certain claims and

amended the remaining claims, to argue *inter alia* that "[t]he present invention is

distinguishable in that the claimed method provides for a switch located at an end

terminal and before the access point to a packet- or line-switching network," supposedly

unlike the switches in Arango.  Amendment 12/12/02 at 9.  The Examiner in an Office

Action dated March 5, 2003 (Exhibit 13), maintained the anticipation rejection based on

Arango, but noted that three dependent claims (not relevant here) would be allowable if

rewritten in independent form.

The Applicants then submitted another Amendment dated July 3, 2003 (Exhibit

14), and argued that various specific aspects of the revised claim language provided

grounds to distinguish Arango '078, including the assertion that, in the amended claims,

"[t]he first switch and the second switch are located at respective end terminals and are

---

[4] A continuation application, No. 11/456,549, has been filed from the '280 application, and is now pending in the Patent Office.  A petition to make the application special has been granted.
[5] For purposes of the present petition, all of the cited references are prior art against the claimed German priority dates, but Requestor reserves the right to challenge this priority date if appropriate during this reexamination or in further court proceedings.

not part of the network infrastructure, but connect to the network infrastructure at access points which are part of the network infrastructure." Amendment of 7/3/03 at 13. In an Office Action dated September 9, 2003 (Exhibit 15), the Examiner again rejected the claims as anticipated by Arango (except for certain dependent claims, which were in allowable form if rewritten), and added an anticipation rejection for the claims based on Jonas U.S. Patent No. 6,137,792, another patent discussed in this request for reexamination. Applicants submitted another Amendment dated March 19, 2004 (Exhibit 16), to address the rejections, and included a lengthy discussion of how various features of the then-pending claims were allegedly not present in Arango or Jonas, including the feature that the switch had to be located at the end terminal of the user and the switch had to be connected through a line-switching connection to an access point to the Internet. See Amendment of 3/19/04 at 16-17, 21, 24.

Applicants then submitted several documents: (i) a further "Supplemental Response" dated June 2, 2004, making the same and additional arguments (Exhibit 17); (ii) a Supplemental Amendment dated June 3, 2004, which added a series of new claims (35-72) and argued, inter alia, that "[n]either Jonas nor Arango disclose the routing of a telephone call or of non-packetized data" (Amendment of 6/3/04 at 25) (Exhibit 18); and (iii) a Second Supplemental Response dated July 2, 2004 (Exhibit 19), that contained repeated argument of the previously stated grounds for why the then-pending claims were not anticipated by Arango or Jonas. In this Second Supplemental Response at pages 6-8, Applicants identified certain corresponding structure for the "means plus function" elements contained in the single then-pending apparatus claim (application claim 68). The Applicants took the position that the structure for the "means" elements is contained

LIBA/1819814.2

entirely within Figure 4 of the patent and the associated text. Applicants also repeated the assertion that in Jonas and Arango, the switches are not located between the first end terminal and an access point of the packet-switching network, as then required by the pending claims. Id. at 8.

The Examiner responded by imposing a restriction requirement under 35 U.S.C. § 121, on August 23, 2004 (Exhibit 20), to require Applicants to elect between two classes of claims, with the newly added second set of claims (35-72) all having the separate utility associated with the claimed feature described by the Examiner as "transferring of non-packetized data from a first end terminal to a second end terminal." Id. at 2. (No such feature is contained in any of the presently challenged claims in the '902 patent.) On September 29, 2004, Applicants elected this second group of claims (35-72). See Exhibit 21. On February 25, 2005, the Examiner issued a Notice of Allowance (Exhibit 22), stating that the elected claims all had the "uniquely distinct features as described on pages 23-26 of the Remarks filed on 6/3/045, and on pages 8-9 of the Remarks filed on 7/2/04," including the features discussed above. Neither Arango nor Jonas, the Examiner stated, anticipated or rendered obvious these particular claims. There is no indication that any other obviousness combinations had been considered. The '453 patent with those claims issued on October 11, 2005.

**b.    Prosecution of the '280 divisional application**

The '280 divisional application that issued as the '902 patent at issue was filed on June 22, 2005. A first Office Action, dated September 14, 2005 (Exhibit 23), rejected the claims for double patenting over the '453 claims, and found then-pending claims 1-34 to be anticipated by White, U.S. Patent No. 6,069,890 (Exhibit 27). White '890 is entitled

"Internet Telephone Service," and it broadly discusses a "system and method for providing telephone type services over the internetwork known as the Internet." See Abstract.

By an Amendment dated March 20, 2006 (Exhibit 24), the Applicants amended the existing claims and added new claims 35-136. In many of the new claims, including the claims at issue in this reexamination request, the Applicants eliminated the limitations that it had relied upon in the '790 application as grounds for distinguishing Arango and Jonas. In the "Remarks" section of the Amendment, the Applicants discussed only the White '890 patent, making no effort to discuss or distinguish Arango or Jonas, even though a number of the claims now read again on those patents. The Applicants did not attempt to claim that its invention encompassed all Internet telephony, but instead made the following statements about the claims as now stated in the Amendment:

> "… Therefore, in the context of an Internet telephone call such as the Internet telephone call of White, claims 1-34 as amended distinguish White by defining a change-over from packet switching to line switching during various phases of the telephone call (including, e.g., during the transfer of call data itself, when the digitized speech is sent over an Internet connection).
>
> New claims 35 to 68 are substantially identical to respective claims 1 to 34 as amended, except in the independent claims 35, 36, and 68, the control signal is produced by a network management system instead of originating from the user of an end terminal. …
>
> New independent claims 69 and 77 are supported by the applicants' specification in a fashion similar to the amendments of claims 1 and 34, but set forth the novel features of the invention from a different perspective. …
>
> New claims 84 to 99 are supported by the applicants' specification in a fashion similar to claims 69 to 83, respectively, but instead of being specifically directed

- 15 -

> to a switch or method of routing a telephone call, these
> claims refer more generally to switching data packets from
> multiple origin end terminals, and establishing and
> maintaining respective communications connections for
> data transfer with real-time properties between origin end
> terminals and destination end terminals identified in the
> data packet headers. …
>
> New claim 100 combines features of claims 84 and
> 87 and further specifies that the data packets are IP packets,
> the packet-switching network is the Internet, and the line-
> switching network is a public telephone network …"

Amendment at 36-38.   In all of these new claims, the Applicants' critical alleged

distinction over the White '890 patent, which otherwise provided a detailed disclosure of

Internet telephony, was that the White '890 patent "fails to disclose or suggest that there

should be a change-over from packet switching to line switching" during any phase of the

initial data transfer over the Internet.  See Amendment at 34-35.

A terminal disclaimer and an Information Disclosure Statement containing more

than 50 new references appear to have been submitted at the same time, and additional

IDS's were filed thereafter.   It also appears from the record that, at this time, a new

Examiner was assigned to the application.

Thereafter the new Examiner issued a Notice of Allowance dated May 23, 2006

(Exhibit 25), in which certain claims were cancelled, one claim was amended, and the

remaining claims were allowed.  The Examiner's statement of reasons for allowance is as

follows:

> "The Applicant's invention relates to dynamically changing
> over to a line switching connection without interrupting the
> connection, data can be transferred with fixed bandwidth
> and slight time delays substantially in real time so that data
> blockage is bypassed.  The closest cited art White et al. (US
> 6,069,890) does not disclose 'a change over from packet
> switching, used for trace routing, to line switching when

- 16 -

> the digitized speech is sent over an Internet connection,
> also a control signal that is produced by a network
> management system instead of originating from the user of
> an end terminal, and a control device that directs the data
> packets from the multiple origin end terminals to either the
> packet switching device or to the line switching device', as
> claimed in independent claims 1, 2, 34, 35, 36, 68, 69, 77,
> 84, 92, 100, 105 and 129 herein." Id. at 3.

After a petition to withdraw from issue was filed, apparently to allow the Applicants to file an additional IDS, another Notice of Allowance dated October 3, 2006 was issued (Exhibit 26), with certain claims being cancelled. The statement of reasons for allowance was revised:

> "The closest prior art, White et al. (US 6,069,890) and
> Farris et al. (US 6,574,216) fail to disclose, taken alone or
> in combination, "a change over from packet switching,
> used for trace routing, to line switching when the digitized
> speech is sent over an Internet connection, also, a control
> signal that is produced by a network management system
> instead of originating from the user of an end terminal, and
> a control device that directs the data packets from the
> multiple origin end terminals to either the packet switching
> device or to the line switching device," as in claims 1, 2,
> 34, 35, 36, 68, 77, 84, 92, 100 and 129 of the instant
> application." Id. at 3.

There is no indication in the record whether these features allegedly missing from White and Farris '216 (Exhibit 28) (another patent related to White that discussed Internet telephony with a specification substantially identical to White) were found in any of the other prior art, nor is there any indication that any other obviousness combinations were considered. There is no discussion, for example, of the applicability of Arango or Jonas, alone or in combination, to the new or amended claims, even though both Arango and Jonas disclosed a mid-connection change-over from data switching over the Internet to line-switching over the ISDN or PSTN.

- 17 -

Moreover, none of the claims are limited to "digitized speech"; a number of the claims explicitly broadly cover transferring "data" generally (e.g., claims 36, 84, 92, 100); many of the claims do not require a control signal produced by a network management system; none of the claims as finally issued in the '902 patent (except dependent claim 121) contain a limitation requiring that packet switching be used for trace routing[6]; and certain claims in the '902 patent do not contain *any* of the recited features (e.g., Claim 2).

During prosecution of the '280 divisional application, the Applicants cancelled claims 105-117; however, the Examiner did not remove these cancelled claims from the allowed claims before the '902 patent issued. The patent owner requested correction of the patent to reflect the cancelled claims, and a Certificate of Correction was issued, which is attached as Exhibit 1, along with a copy of the '902 patent.

In short, although the art relied upon in this request is of record on the face of the '902 patent, the actual substance of the art cited below was not discussed or addressed in the file history in connection with the '902 claims challenged in this request for reexamination.

## E.   STATEMENT POINTING OUT EACH SUBSTANTIAL NEW QUESTION OF PATENTABILITY

As will be fully explained and supported below, based on a series of prior art patents including not only Arango and Jonas, but also the other patents discussed herein, it was well known in the art at the time of Schindler et al.'s purported invention that a line-switched connection could be used as an alternative or bypass for the transmission of telephone calls or other data over a packet-switched network, and that the change-over

---

[6] This term is also undefined and not used in the '902 patent itself.

from a packet-switching transmission to a line-switching transmission could be done in response to a control signal, during an existing call, without interruption of the connection or a call set-up procedure. Not only had the problems of packet-switching transmissions been recognized, but it had also been realized that the establishment of a new connection over a line-switched network for alternate transmission of the data was an obvious solution to the problems. Specific technical solutions for creating a bypass line and causing a change-over of the communication had also been identified and disclosed in the prior art, including essentially identical structures of switches for performing the change-over.

Accordingly, Requestor respectfully requests that the Examiner issue a rejection of each of the issued claims of the '902 patent as unpatentable under 35 U.S.C. § 102 and § 103 in view of numerous prior art references provided herewith. Each and every element of the claims under reexamination is found in several and multiple references provided herewith when the claims are given the broad interpretation that Teles has advanced in the concurrent litigation. Therefore, a substantial new question of patentability is raised by these references.

More specifically, for the reasons set forth in the discussion and claim charts below, the following prior art references are anticipatory:

-- U.S. Pat. No. 5,610,910 (Focsaneanu '910) anticipates claims 36, 37, 54, 55, 56, 57, 58, 61, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87, 90, 91, 92, 95, 98, 100, 102, 104, 118, 119, 120, 122, 123, 124, and 125 of the '902 patent under 35 U.S.C. 102(a);

LIBA/1819814.2

-- U.S. Pat. No. 6,137,792 (Jonas '792) anticipates claims 36, 37, 54, 55, 60, 61, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87, 90, 92, 95, 98, 100, 102, 118, 120, 121, 122, 123, and 124 of the '902 patent under 35 U.S.C. 102(a);

-- U.S. Pat. No. 4,996,685 (Farese '685) anticipates claims 36, 41, 54, 55, 60, 62, 64, 68, 69, 71, 75, 77, 79, and 82 of the '902 patent under 35 U.S.C. 102(a);

-- U.S. Pat. No. 5,732,078 to (Arango '078) anticipates claims 36, 37, 84, 90, 92, 98, 118, 120, 121, 122, 123, and 124 of2 the '902 patent under 35 U.S.C. 102(a);

-- U.S. Patent No. 5,598,411 (Matsukawa '411) anticipates claims 36, 68, 69, 71, 75, 77, 79, and 82 of the '902 patent under 35 U.S.C. 102(a); and

-- U.S. Pat. No. 5,347,516 (Yoshida '516) anticipates claims 36, 37, 54, 55, 56, 58, 62, 64, 68, 69, 71, 75, 77, 79, 82, 84, 87, 90, 92, 95, and 98 of the '902 patent under 35 U.S.C. 102(a).

Additionally, for the reasons set forth in the discussion and claim charts below, various combinations of prior art render the challenged claims invalid for obviousness, specifically:

-- Claim 36 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Farese '685 or Arango '078 or Matsukawa '411 or Yoshida '516  and the Lucent Press Release of 9/17/96 ("Lucent");

-- Claim 37 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 or Farese '685 or Yoshida '516;

-- Claim 41 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Farese '685 and Jonas '792 or Arango '078;

--      Claims 54 and 55 of the '902 patent are obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Farese '685 or Yoshida '516;

--      Claims 56-58 of the '902 patent are obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Farese '685 or Yoshida '516 and Lucent;

--      Claim 60 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 and Farese '685;

--      Claim 61 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 or Farese '685 and Lucent;

--      Claim 62 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 or Farese '685;

--      Claim 64 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Farese '685 or Arango '078 or Yoshida '517;

--      Claim 66 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Farese '685 or Arango '078 and Lucent;

--      Claims 68, 69, and 75 of the '902 patent are obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 or Farese '685 or Matsukawa '411 or Yoshida '516 and Lucent;

--      Claim 71 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Farese '685 or Matsukawa '411 and Lucent;

--      Claim 77 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 or Farese '685 or Matsukawa '411 or Yoshida '516 and Lucent;

- 21 -

--       Claim 79 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Farese '685 or Matsukawa '411 or Yoshida '516 and Lucent;

--       Claim 82 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 or Farese '685 or Yoshida '516 and Lucent;

--       Claim 84 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 or Yoshida '516 and Lucent;

--       Claim 87 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 or Farese '685 or Matsukawa '411 or Yoshida '516 and Lucent;

--       Claim 90 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 or Farese '685 or Matsukawa '411 or Yoshida '516 and Lucent;

--       Claim 91 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 or Yoshida '516 and Lucent;

--       Claim 92 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 or Farese '685 or Matsukawa '411 or Yoshida '516 and Lucent;

--       Claim 95 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Farese '685 or Matsukawa '411 and Lucent;

LIBA/1819814.2

--      Claim 98 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 or Farese '685 or Matsukawa '411 or Yoshida '516 and Lucent;

--      Claim 100 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 and Lucent;

--      Claim 102 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 and Lucent;

--      Claim 104 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 and Lucent;

--      Claim 118 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 and Lucent;

--      Claim 119 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 and Arango '078;

--      Claim 120 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 or Lucent;

--      Claim 121 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078;

--      Claim 122 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 or Farese '685 or Matsukawa '411 or Yoshida '516 and Lucent;

--      Claim 123 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 or Farese '685 or Matsukawa '411 or Yoshida '516 and Lucent;

- 23 -

--    Claim 124 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 and Arango '078; and

--    Claim 125 of the '902 patent is obvious under 35 U.S.C. 103(a) over Focsaneanu '910 in view of Jonas '792 or Arango '078 and Lucent.

The statutory presumption of validity under 35 U.S.C. § 282 has no application in reexamination. *See* MPEP § 2258 G (citing *In re Etter*, 756 F.2d 852, 225 USPQ 1 (Fed. Cir. 1985)). During reexamination, claims are to be given their "broadest reasonable interpretation consistent with the specification and limitations in the specification are not read into the claims." *See* MPEP § 2258 G, citing *In re Yamamoto*, 740 F.2d 1569, 222 USPQ 934 (Fed. Cir. 1984).

A substantial new question exists where, as here, art previously cited or considered "is being presented/viewed in a new light, or in a different way, as compared with its use in the earlier concluded examination(s), in view of a material new argument or interpretation presented in the request." M.P.E.P. ¶ 2642 II(A). As noted above, only two of the references cited below (Jonas and Arango) were discussed by the Examiner in the parent application, and at the time the pending claims contained additional limitations that were relied upon by the Applicants to distinguish Jonas and Arango, but which do not appear in the claims at issue here. "The existence of a substantial new question of patentability is not precluded by the fact that the patent or printed publication was previously cited by or to the Office or considered by the Office." 35 U.S.C. § 312(a).[7]

---

[7] "It is only necessary to establish that a substantial new question of patentability exists as to any one of the patent claims in order to order reexamination. In the examination stage of the reexamination, normally all patent claims will be reexamined, even where the order has made a finding of a substantial new question for less than all of the patent claims." MPEP 8TH ed., Rev. 2 (May 2004) § 2240 (p. 2200-46).

Moreover, the recent decision by the United States Supreme Court in *KSR Int'l Co. v. Teleflex, Inc.*, 127 S.Ct. 1727 (2007), has altered the obviousness standard applied in situations such as that presented by the '902 patent. Casting aside a rigid "teaching, suggestion, motivation-to-combine" test for obviousness, the Supreme Court warned against granting of a patent that is no more than "the predictable use of prior art elements according to their established functions." *Id.* at 1740. This sea change in the obviousness analysis raises additional questions of patentability especially here where the patentee admits that "[t]he technologies used are known per se" and is simply claiming the combination of known elements and techniques that produce a predictable result. '902 patent at Col. 6:56.[8]

**F.     DETAILED EXPLANATION OF PERTINENCY AND MANNER OF APPLYING CITED PRIOR ART TO EVERY CLAIM FOR WHICH REEXAMINATION IS REQUESTED**

**1.     Overview of the Prior Art**

The following overview discusses seven prior art references that are being relied upon here to anticipate certain of the claims of the '902 patent and/or render the claims unpatentable under 35 U.S.C. § 102. These references and their detailed application to the '902 patent claims are described in the sections that follow, and the claim charts submitted herein also provide details of the references on a claim-by-claim basis.

**a.     U.S. Patent No. 5,610,910 (Focsaneanu '910), Exhibit 6**

U.S. Patent No. 5,610,910 (Focsaneanu '910) is entitled "Access to Telecommunications Networks in Multi-service Environment." It was filed in the U.S. Patent Office on August 17, 1995, and issued on March 11, 1997. Focsaneanu '910 is prior art under 35 U.S.C. § 102(e).

---

[8] A detailed analysis of the obviousness issue is included below in Section F.2.

LIBA/1819814.2

Focsaneanu '910 broadly covers an "Access Module," or switch, that enables a wide variety of end terminal equipment, including telephones, to make connections through the PSTN or a data network such as the Internet and to dynamically change those connections between the different switching modes.  Figure 7 of Focsaneanu '910 provides an overview of the various different kinds of equipment and network services that are able to use the access module described in the '910 patent:



The patent, in describing the motivation for its invention, previews the same issues/ problems later identified in the '902 patent.  Focsaneanu '910 describes the channelized inefficient nature of existing voice telephony networks where multiple services have varying demands for bandwidth and holding times, or a service generates traffic that is bursty in nature. The invention of Focsaneanu '910 solves these problems by providing flexible and adaptable multiservice access to PSTN (line switched) and data

- 26 -

(packet switched) networks, including the Internet. Customer requirements are checked by monitoring traffic at a connection request and/or during the established connection, and the local access is configured according to the transmission requirements. The local access can also be configured in response to the network information. See, e.g., Abstract. The system and method describe the ability to switch between a packet switching data network and a line switching PSTN network in real-time, based on customer needs or conditions set and evaluated by monitoring the network.

The inventions described in Focsaneanu '910 relate particularly to a multi-service platform which allows consumer devices such as a telephone set (customer premise equipment or CPEs), to access a plurality of telecommunication networks, including the internet and public switched telephone network (PSTN). Col. 1:7-45. Focsaneanu '910 identifies the fixed channelized bandwidth of PSTN networks and the cost savings of packet switched networks, but recognizes the two types of networks exist separately and independently. Cols. 1:45-45; 2:20-24; 2:40-48. An object of the invention in Focsaneanu '910 is to provide better utilization of customer equipment such as telephones by providing an intelligent connection (or switch) to multiple types of transport networks in multiple protocol environments, such as a PSTN network and the internet's packet switched network. Another object is to provide optimization and alternate routing of services among transport networks. Col. 4:10-35.

The inventors of '910 patent recognized the number of subscribers to the "Internet" was growing at a very fast pace and expected that growth in the usage of data networks to continue. They also recognized that access to such packet switched data networks through the existing telephone network and subscriber's loop was very

- 27 -

inefficient and cumbersome.[9]  The invention described in Focsaneanu '910 is directed to solving these problems to create a global data network with capabilities of switching between network types such as PSTN and the internet freely and efficiently. Cols. 6:45-52; 6:64-7:9.  The '910's method of switching between line switching (PSTN) networks and packet switching (data) networks is described in the same manner and implemented for the same reasons as later stated in the '902 patent:  efficiency and cost savings.

As noted above, Figure 7 of Focsaneanu '910 and the corresponding text in the specification describes an "access module 208" or switch in which a plurality of consumer equipment including telephones can access a plurality of different types of services provided by service providers which may utilize different types of transport networks, such as a line switched network PSTN 212 and data (packet) switched networks 214.  "The data switched networks may include, among other networks, a packet switched network, an ATM network using protocols such as TCP/IP, X.25, ATM, etc.  Two types of local switches, one with a D channel handler for ISDN access and one without it, are shown in the PSTNs." Col. 7:10-20.

Figures 8 and 13 of Focsaneanu '910 and the corresponding text in the specification describes a switch called "access module 234" in more detail.  The switch or access module 234 in Figure 8 is at the end of the local access line and has a line interface 236 for local access by consumer telephone and computer equipment.

---

[9] Figure 4 of Focsaneanu '910 shows a conventional PSTN line or circuit switched network.  Figures 5 and 6 of Focsaneanu '910 show how telephone sets and computers are connected through a PSTN in the known ISDN environment to provide both line switched and packet switched connections. 6:3-44.

- 28 -



Fig 8

The switch (access module) of Figure 8 in Focsaneanu '910 includes a processor 246 that performs a selection and enablement of either POTS (plain old telephone service) line switching service or data services such as packet switching. The access module or switch also has a local database 248 which stores information concerning user profile, address table and service provider profile, etc. A controller 252 analyzes the contents of a data connection request to identify the service requested. Upon identification of the type of service requested, the controller performs address conversion, protocol conversion, rerouting etc., and exchanges packetized data formed at PAD 254 (packet assembly/disassembly) with the data network in accordance with information stored in the database. Information arriving at the switch in non-packetized form can be packetized, if necessary in the PAD 254 (or at PAD 550 in Figure 13). The information from the database may also require the switch to perform multiplexing functions from other line interfaces 256 by MUX 258. Col. 8:1-27.

- 29 -

A customer's service request is detected in the switch (access module) and a determination is made whether the request is for data (packet) services or PSTN services. The type of data service is determined by consulting a database. The service request comes to the switch (access module) from either direction, in one instance a near end user requests a service from service providers and in another, in response to a service request from a far end user, a service provider requests an access module to make a connection to any phone equipment at the near end user. Detection of a service request is performed by a "service default" procedure. When the access module is in the service default state, the network is normally receiving and expecting packet data. Therefore data can be initiated from or received by the consumer phone equipment at any time. In the PSTN mode the default is POTS or line switching services. The switch (access module) can alter the state of the access at any instant after a service request is received. Col. 9:30-51.

A change of mode can be caused by an initiated request by the user, or by an automated observation of the channel, where the switch (access module) monitors customer communications activity during an already-established call. Col. 10:20-24. By using information stored in the database, protocol translation, and address conversion, it is possible to mediate services on a service by service basis through the use of mediation in the switch (access module) based on tables under the control of both the users and services providers. The switch or access module can then interface with a variety of data networks to deliver/receive the data services traffic. The actual network selection is based on the information contained in the user service profile. An embodiment of this functionality includes one or more circuits providing gateway functions to the associated network equipment. Col. 10:61-11:4

LIBA/1819814.2

Figure 13 of Focsaneanu '910 shows another embodiment of the access switch in which "the access module can dynamically select a different network from the one prescribed in the user profile, to carry the packetized data traffic.  This alternate selection will not adversely impact the quality of service (QOS).  An example of the use of this capability is to route data traffic on PSTN during low traffic load periods. Similarly, the access module can packetize voice at PAD 550 (packetize/depacketize) and route voice traffic on a data network.  The voice service QOS is maintained by continuous monitoring of the transmission delay." Col. 11:7-21 & Figure 13.



*Fig 13*

Several non-content altering functions include data compression at 552 and statistical multiplexing at 554 of Figure 13. The transceiver in the switch or access module monitors the traffic coming in from both directions using a database storing the user profile, the available communications resources and the status of these resources.  The

LIBA/1819814.2

processor in the access module determines an intelligent method of handling the customer traffic by consulting the database information. Col. 11:60-67.

The switch allows the user to designate an intention to place a POTS call or establish a data connection by various means, including abbreviated dialing and other means of passing status information and control messages to the access module. Col. 13:5-15. The methods can also be used "to initiate a change from an established data call to a voice call, or from an established voice call to a data call." Col. 13:32-34.

The switch or access module also has the capability of providing conversion between packetized voice and PCM to allow for alternate routing. Col. 13:41 et seq. "This allows the use of a multiplicity of access and transport networks in the establishment, translation, and completion of a service transaction by the access module under the control of the end user. Providing protocol translation, address conversion, and mediation of services on a service by service basis is also possible." Col. 13:41-49. The switch or access module provides address translation and address correlation functions by specific routing tables that are contained in the switch module. These routing tables are updateable from various sources in the overall network for use in, for example "the correlation of an Internet user address with his PSTN address for delivery of voice traffic originated on a computer to a telephone set." Col. 13:41-49; 62-67.

The invention disclosed in Focsaneanu '910 "provides for logical assignments in real time at the access module or services provider for alternate routing among available transport networks, e.g. voice can be routed over data (packet) networks and data can be routed over PSTN networks. This allows dynamic traffic load balancing, alternate routing, resource sharing and service management of the information transfer throughout

- 32 -