the network, thereby minimizing protocol and transport translations between the end points." Col. 14:13-20.

The switch (access modules) described in Focsaneanu '910 has all the detailed features of the switch described and claimed in the '902 patent as shown below. This can be readily shown by comparing the switch structure disclosed in Figures 8 and 13 of Focsaneanu '910 with the switch structure disclosed in Figure 4 of the '902 patent. The structures are identical in all material respects:

**Focsaneanu '910**    **'902 Patent**



| Focsaneanu '910 Figs. 8 & 13 | | | '902 Patent Fig. 4 | |
|---|---|---|---|---|
| Access Module | 234 | Same or Equivalent | Switch | 7 |
| Processor | 246 | Same or Equivalent | Control Device | 71 |
| PAD (packet Assembly-Disassembly) | 254 (550 in Fig. 13) | Same or Equivalent | Packet/Unpacket | 713/714 |
| Controller | 252 | Same or Equivalent | Change Over Control | 711 |
| Local Database | 248 | Same or Equivalent | Data Bank | 75 |
| MUX (Multiplexer) | 258 | Same or Equivalent | Multiplex/Demultiplex | 732 |
| Transreceiver | 238 | Same or Equivalent | Intermediate Register | 712 |
| PCM | 552 | Same or Equivalent | Coupling Field | 731 |

- 34 -

| Focsaneanu '910 Figs. 8 & 13 | | | '902 Patent Fig. 4 | |
|---|---|---|---|---|
| Data Compression (Fig. 13) | 554 | Same or Equivalent | Data Compression | 721 |

Thus, Focsaneanu '910 discloses not only the same problems and issues to be addressed by the access switch, it identifies the very same solutions and the same structure, all in anticipation of the claims of the '902 patent.

### b.    U.S. Patent No. 6,137,792 (Jonas '792), Exhibit 7

U.S. Patent No. 6,137,792 (Jonas '792) is titled "Method and Apparatus for Enabling Transmission of Data Packets Over a Bypass Circuit-switched Public Telephone Connection." The application leading to Jonas '792 was filed on June 14, 1996, and the patent issued on October 24, 2000. Jonas '792 is prior art under 35 U.S.C. § 102(e). Jonas '792 is another prior art example of employing a change-over from packet-switched transmission of data from an originating end terminal through a router and then over the Internet, to line-switched transmission of data from the same call over a line connection, such as the ISDN or PSTN, to the same destination end terminal.

Jonas '792 discloses that computers can be networked together via a public packet-switched network known as the "Internet" and that public packet-switched networks are themselves comprised of networks of other packet-switched networks. Col. Col. 1:23-26; 46-47. Jonas '792 recognized the problem when communicating across public packet-switched networks, such as the Internet, of the presence of "delays" or pauses which occur when a packet must wait for transmission-related resources to become available at individual routers or nodes along its path. A user transmitting or receiving critical data across a network may not be willing to tolerate these delays. Accordingly, Jonas '792 disclosed "a need for a method and system to enable computer

- 35 -

users connected to a public packet-switched network to transmit at least a portion of a communication between hosts on a circuit or line switched network with minimal delay time, and acknowledged that such a method may require additional costs and resources, as compared to transmitting solely over the Internet. Col. 3:4-23.



*FIG. 1*

Figure 1 of Jonas '792, above, helps to illustrate the invention. The originating host computer 1 and the destination host computer 2 are each connected to the public packet-switched network via router computers, or switches. Each router is also able to connect with one or more other routers via the line-switched telephone network. The originating host 1 can begin a data transmission by, for example, placing a call to the router 20 "via a switched dial-up connection provided by the local telephone service." Col. 4:3-8. The router 20 then establishes a connection for packet switching of the data for the call data over the Internet to the receiving router 21 and the second host 2.[10] Packet switching communication of data begins. During the transmission, packets to be sent over the alternative network may be so designated in the IP header or through other

---

[10] The disclosed system can clearly accommodate multiple origin and destination end terminals, as the "[r]outers 20 and 21 are typically provided by an Internet Commercial Service Provider, however, alternate configurations are also available, such as one or more of the hosts being directly connected to the Internet as a router or gateway computer." Col. 4:8-13.

LIBA/1819814.2

means.[11] Col. 4:42-53. The sending router 20 determines from the header that the data is to be transmitted over the bypass network, and establishes a connection over the line-switched telephone network to router 21, and then changes over to transmit the data through the bypass line-switched telephone network. Col. 3:35-47. The bypass line-switched network connects the source and destination routers 20 and 21 respectively. The routers may transmit the packet over a regular dial-up analog phone line or the packets may be transmitted over public ISDN telephone facilities. Col. 4:21-26.[12]

"The host may wish to transmit via the bypass network if the delay time over available paths on the Internet is unacceptable, such as for interactive or other time-critical applications." Col. 4:17-20. The reference to "interactive" or other "time critical applications," would suggest to a person of skill in the art that the bypass might also be used for voice communications or other "communications connections for data transfer with real-time properties" (as claimed in, e.g., Claims 84, 92 and 100 of the '902 patent).

The source router 20 in Figure 1 has sufficient logic to determine whether there is an existing alternate network connection to the destination router 21 by examining a memory file of existing alternate network routers. Where multiple "classes of service" are allowed, the source router 20 must further determine whether the existing link meets the

---

[11] The specification discloses that it will be apparent to those of skill in the art that the packet-switched network may support any of a number of protocols, such as TCP/IP, DECnet, or the ISO/OSI protocol. Moreover, both the source and destination routers 20 and 21 may be physically the same computer as the source host 1 and destination host 2, respectively, thereby placing all the logic for determining when and how to switch from the line switched network to the packet switched network in the routers. 6:11-26.

[12] Jonas '792 explained that those skilled in the art would understand that many variations of public telephone networks are possible, and the intent of the invention being to utilize a line-switched connection over at least a portion of the data path between the source router 20 and the destination router 21. For example, a portion of an ISDN route may include a packet-switched segment. As used herein, the term "packet-switched" shall include both packet and message switched connections. 4:21-36

- 37 -

desired class of service. If there is no suitable existing connection, the source router 20 will determine the address of the destination router 21 on the circuit-switched network. Again, where multiple classes of service are allowed, the source router 20 must also determine whether the destination router 21 is capable of receiving the appropriate connection. The source router 20 then establishes a connection (i.e. "dials" the call) over the line-switched network 30 to the destination router 21 and updates the memory file of existing alternate network connections. Jonas '792 specification states "It will be obvious to those skilled in the art that multiple alternate designation networks or connections may be used each having different characteristics, such as delay time (circuit-switched or packet-switched subpaths) and bandwidth. Col. 4:53-5:7.[13]

The specification also expressly contemplates applications which may "dynamically take advantage of both the inherent cost benefit of using the packet-switched Internet and the minimal delay time of circuit-switched telephone networks....by having the system monitor the transmission delay between the source router 20 and destination router 21... [and if] this delay rises above a threshold value the source router 20 will establish a connection over the bypass network 30." In such an instance, the control signal for changing over to line switching is generated by the management software of the router, not by the end user(s). The source router may detect the transmission delay using a variety of measures known to those skilled in the art, including topological delay time for the transmission, cost, or the number of gateways

---

[13] The Jonas '792 patent further discloses that once a connection between source and destination routers 20 and 21 has been established, the source router 20 will monitor the traffic between the source and destination routers and will disconnect the line-switched connection if there is no activity in either direction after a preset time, preferably 60 seconds, although this time-out period may also be either end-user or router-administrator configurable.

through which the network path traverses ("hops").  While transmitting over the bypass network 30, the source router 20 may continue to monitor the delay time between the source router 20 and destination router 21 by sending occasional "ping" messages to the destination router 21 and monitoring delay times of any response packets.  Col. 5:45-6:3.

The Jonas '792 patent also describes that different data from a single communication can be transmitted by means of the bypass over packet and line switched networks during the ongoing communications connection (i.e., a single call).  See, e.g., Col. 2:54-67 (referring to the present invention as a potential alternative to encryption, and stating "there exits a need for a method and system to enable computer users communicating across the Internet to transmit *at least a portion of the communication* across a network having a low initial connection costs, such as a circuit-switched public phone network ...."); Col. 3:15-20 ("there exists a need for a method and system to enable computer users connected to a public packet-switched network to transmit *at least a portion of a communication* between hosts on a circuit-switched network with minimal delay time.").  Thus, first data from a call may be sent over the packet network, and second data over the switched network, and the data from this single communication are combined again in the second router.  Col. 5:8-12 ("The destination router 21 will receive notification of an incoming call over the circuit-switched network and execute a process to accept the connection and integrate data packets from this connection into the packets received from the packet-switched connection. ... If the data protocol is 'connection oriented,' such as the TCP protocol, the data packets must be reordered into a sequential order by the receiver.").  Thus, Jonas explicitly applies to the sending of "first data" of a

- 39 -

single connection on one network and "second data" on the other, without interrupting a call set up procedure or an existing connection.

### c.    U.S. Patent No. 4,996,685 (Farese '685), Exhibit 9

U.S. Patent No. 4,996,685 (Farese '685), entitled "Technique for Dynamically Changing an ISDN Connection During a Host Session," was filed on April 10, 1989 and issued February 26, 1991.  Farese '685 is prior art under 35 U.S.C. § 102(a) and 102(b). Farese '685 describes a platform and a technique that "<u>dynamically</u> change[s] the ISDN access path <u>between packet switched</u> connection and a circuit switched connection during an ongoing host session with the user in order to provide a particular ISDN connection that is most suited to the communication requirements of a current task being executed by the host computer during the session."  Col. 1:12-18 (emphasis added).

Schindler et al. knew about Farese '685 as they described the patent in the Background of the Invention and acknowledged that Farese '685 showed the same type of "dynamic" change-over from packet switching to line switching they now were trying to claim in the '902 claims.   See '902 patent at Col. 2:33-41.    Nonetheless, they incorrectly denigrated the Farese '685 teachings as being applicable only to ISDN, and not to the transfer of data in a network:

> "The method disclosed in U.S. Patent No. 4,996,685 is restricted to undertaking on an ISDN connection a change between a line-switching and a packet-switching data transfer whereby a line-switching transfer is carried out on a B channel and a packet-switching transfer is carried out on the D channel.  A method of this kind is indeed expedient to produce effective access from an end subscriber to a host computer, possibly an exchange point of the telephone network or an access point to the Internet, <u>but does not relate to the transfer of data between switches or routers of a network</u>."  '902 patent at Col. 2:33-52 (emphasis supplied).

- 40 -

A review of the Farese '685 specification, however, confirms that Farese's invention was not limited to connection between a single user and a host over a single ISDN line, but was broadly applicable to transmitting data in a network with many end users, each of whom are communicating with one or more hosts by packet or line switching through a network containing multiple ISDN switches that can each carry packet-switched or line-switched connections. See, e.g., Col. 11:21-25 ("Although a single ISDN switch is shown at one central office, this switch would in actuality likely be replaced by an ISDN network that contains multiple ISDN switches inter-connected by appropriate end-to-end transport and toll switching facilities."); Col. 11:36-37 ("Host system 70 illustratively contains independent host computers 70-1 and 70-2 …"); Col. 13:3-5 ("System 5 can accommodate a multitude of users to dynamically change the ISDN channel (between circuit and packet switched) used by each user …").

Thus, although Farese '685 was submitted to the Patent Office during prosecution of the '902 patent, the patentees mischaracterized the reference. This factor along with the sheer number of references that were submitted during the prosecution of the '902 patent makes it not surprising that when the specific references in this Request are considered, a substantial new question of patentability is presented and the claims of the '902 are not valid.

Turning back to the disclosure of Farese, the '685 inventors recognized that "a need exists. . . for dynamically changing an ISDN path. . . between a circuit switched connection and a packet switched connection during a host session according to the communications demands of the host computer that occur during the session." Col. 6:35-42; id. at 6:4-35 (discussing the reasons for the need, including that "circuit switched

LIBA/1819814.2

connections are far more expensive than packet switched connections," and thus it is preferable not to leave the circuit switched connections open during times when packet switching is itself adequate for the transmission).

The inventors of Farese '685 provided a solution through a "technique for use in conjunction with an ISDN switch for dynamically changing an ISDN access path that connects a user to the switch and therethrough to a host computer, between a circuit switched connection and a packet switched connection during a host session according to the communication demands of the host computer that occur during the session." Col. 6:36-42. The solution was that the "ISDN connection provided over the access path, rather than being static as is taught in the art, dynamically changes in response to commands (suitable control messages) that are issued by the host computer." Col. 7:4-8. The invention allows "dynamically changing the ISDN path. . . from a first connection such as a B channel circuit switched connection, to a second connection, such as a D channel packet switched connection or vice versa during an ongoing host session. . ." Cols. 6:58-7:4.[14] The dynamic change occurs "in response to a command received from the host computer during execution of the host session." Col. 7:14-33. "The host commands, such as 'Transition to D Channel' and 'Transition to D Channel' are determined by the communication requirements of the current task." Col. 7:43-46.

---

[14] ISDN provides "B" channels and "D" channels. Col. 1:29-31. "The 'D' channel can only carry packets; while each of the 'B' channels can carry either packets or continuous (circuit switched) signals." Col. 1:33-36. When a call is initiated, either a packet switched connection or circuit switched connection may be selected. Col. 1:36-46. "With this arrangement, an ISDN switch can provide either a circuit switched connection or a packet switched connection to a caller." Col. 1:47-49.

- 42 -

FIG. 1



Figure 1 of Farese '685, above, shows a configuration of the invention. The host computer 70, by determining whether and when to issue the change-over control instructions, and working together if necessary with a second "Broker PC," functions as a network manager for the system. See, e.g., Cols. 20:62-23:36 & especially 21:68-22:4 ("the "transition requests messages are interpreted by the Broker PC as discussed above to dynamically manage the ISDN connection"). Management of the ongoing packet-switching connections by the host computer could involve monitoring the ongoing packet switching traffic and determining whether certain thresholds are exceeded. See, e.g., Col. 23:26-36 ("the host computer could analyze the actual communication occurring between itself and a user and decide, based upon various pre-defined rules that specify specific thresholds for e.g., during and/or amount of communication flowing in each direction between the user and the host computer, which type of access path should be established

- 43 -

for any given situation and then, based upon whether these thresholds were exceeded or not, dynamically change the type of ISDN access path accordingly"); see also Col. 34:18-25 ("the host computer could employ a suitable algorithm, which statistically determines on a global basis … whether a B or D channel ISDN connection should be used in a given situation").

Even more important, the inventors of Farese '685 explicitly recognized that, while the embodiment shown in Farese '685 is directed toward packet switched communication on an ISDN "D Channel" and circuit switched communication on an ISDN "B Channel," the invention was applicable broadly and could be used with any two different communication networks, stating:

> *"After reading the following detailed description, those skilled in the art will clearly realize that the teachings of the present invention can be readily applied to and incorporated within substantially any transmission network that can connect a host computer to a user through two or more separate communication connections that have different attributes, such as illustratively throughput, transport delay or cost of use.* For example, one such connection may be optimized to carry high density low-delay traffic; while the other connection may be optimized to carry low density traffic that is relatively delay insensitive." Cols. 9: 36-10:4 (emphasis added).

Another example given for potential use of the Farese '685 invention is the broadband ISDN network, which would include the transmission of "voice and other delay sensitive traffic … over circuit switched connections," and in which other traffic "could be routed on a packet basis through packet switched connections established through channels designed to be interfaced to respective local and/or metropolitan area networks." Col. 9:53-64. The specifications discussion of particular embodiment shown in the figures was "for purposes of illustration and to simplify the following discussion," not to limit

the applicable scope of the '685 teachings. Id. at 65-68. Notably, the claims of the Farese '685 patent themselves are not limited to the ISDN but they too specifically teach and suggest the applicability of the change-over to other types of communications connections. See, e.g., Farese Claim 10 at Col. 36:31-58

### d.    U.S. Patent No. 5,732,078 (Arango '078), Exhibit 29

U.S. Patent No. 5,732,078 (Arango '078), was filed on January 16, 1996 and issued on March 24, 1998. Arango '078 is prior art under 35 U.S.C. § 102(e). The Arango patent states that "[t]he present invention is directed to communication networks, such as the Internet, which include multiple host nodes, or hosts, and multiple router nodes, or routers. The patent describes, among other things, changing over between a packet switching of data over a WAN such as the Internet and the line-switching of data by means of a special bypass connection established on a "guaranteed bandwidth network," such as the PSTN or the line switched ISDN. See, e.g., Abstract & Figure 6. The patent also describes the ability to switch some data from a connection between end terminals on a packet switched WAN and other data from that connection on the guaranteed bandwidth network. Col. 8:12-21 (referring to "selective routing of some packets from a source node to a destination node via the wide area network and other packets from the same source node to the same destination node via the guaranteed bandwidth network"). Thus, Arango '078 describes a method and structure by which:

> "[t]he access point, of a host that desires to establish a time-
> sensitive communication with a second host, communicates
> with a second access point of the second host via the
> Internet backbone. The two access points then set up a
> continuous bandwidth channel via a supplementary
> guaranteed bandwidth network which bypasses the Internet
> backbone. The present invention thus achieves the goal of
> time-sensitive communications, from end-to-end, within a

LIBA/1819814.2

> predictable time interval, while minimizing costs and
> administrative burdens." Col. 8:59-9:3.

Examples of time-sensitive communications to which the invention would apply are "text, audio, video, etc. which must simply be transferred from a source host to a destination host within a time certain," and "streamed communication," such as "interactive video or audio communications." Col. 3:55-4:12.

FIG. 7



Figures 6 and 7 show slightly different configurations of the invention, in which an "access point" is used to connect a host 210 both to the WAN (or Internet) and a guaranteed bandwidth network. In Figure 7, above, the host 210 is connected via an access link 212, which can be analog or a digital line, to an access point 320. The access point 320 is connected to the two networks. See Col. 14:45 et seq. A similar access point 240 is connected to the two networks on the receiving side, and to a second host 250. The access point contains two servers to control its operation in response, inter alia, to directions contained in the headers of packets received by the access point, as well as a router 224 for the WAN packet network and a router for the guaranteed bandwidth network 226.

- 46 -

At Cols. 19-20, Arango '078 describes how certain first data from a telecommunications connection is sent from one host through the first and second switches and to the other host over the packet network, before a change-over, after which additional data from that communication is then sent over the special bypass connection established through the guaranteed bandwidth network (the long paragraph from the patent has been broken up for ease of reading):

> "An access point is provided with a first link to the Internet backbone on which packets are communicated using a best effort scheme at an uncontrollable, unpredictable and fluctuating rate. The access point also has a second link to a guaranteed bandwidth network on which the access point is able to, on demand, establish a continuous bandwidth channel with an arbitrary other access point.
>
> The first host can generate a packet requesting that the access point establish a continuous bandwidth session with a second host. In response, the access point transmits a packet via the first link and the wide area network to a second access point to which the second host is connected. The transmitted packet contains a request to set up a continuous bandwidth channel between the two access points, for communication between the two hosts. The access point, to which the first host is connected, and the second access point, to which the second host is connected, establish a continuous bandwidth channel via the second link and guaranteed bandwidth network.
>
> The access point, to which the first host is connected, communicates packets between the first and second hosts via the second link, i.e., receives packets destined to the first host from, or transmits packets originating from the first host to, the second link. Thus, the access point performs the preliminary negotiations with another access point via the Internet backbone.
>
> The two access points then set up a continuous bandwidth channel via a supplementary guaranteed bandwidth network which bypasses the Internet backbone.
>
> The present invention thus achieves the goal of end-to-end, guaranteed bandwidth communications, within a

- 47 -

> predictable time interval, for time-sensitive communications, such as streamed communications or communications which must be completed, end-to-end, within a certain time interval. Such communications are achieved while minimizing costs and administrative burdens." Cols. 19:66-20:32.

Arango thus discloses a method of and structure for communicating first between the two hosts by packet switching and then changing over to line switching for the remainder of the communication, and doing so for "time-sensitive communications" such as interactive video or audio presentations, in order to avoid the delays associated with transmissions of such data over the Internet.

### e.    U.S. Patent No. 5,598,411 (Matsukawa '411), Exhibit 10

U.S. Patent No. 5,598,411 (Matsukawa '411) is entitled "ISDN Terminal Adapter Capable of Automatically Changing From a Packet Switching Mode to a Circuit Switching Mode." The application leading to Matsukawa '411 was filed in the U.S. Patent and Trademark office on Nov. 29, 1994, with a foreign priority date of Dec. 3, 1993. The patent issued on January 28, 1997. It is prior art under 35 U.S.C. § 102(e).

Matsukawa '411 is directed toward an ISDN terminal adapter that allows data communication by both packet switching and circuit switching. Col.1:9-14. Matsukawa recognized a need "to automatically change from data communication by packet switching to data communication by circuit switching" when a fault occurs. Col. 1:29-38. To resolve this perceived limitation in the art, Matsukawa disclosed a system that "automatically changes from data communication by packet switching to data communication by circuit switching when a data communication fault is generated in the packet switching mode." Col. 1:43-47. One such fault that Matsukawa specifically

- 48 -

addressed was the occasion of "a large amount of delay in the transmission of data in the packet switching mode." Col. 1:48-53.[15]

An embodiment of the overall structure for the change-over switch described in Matsukawa '411 is shown in Figure 5.

### Fig. 5



Figure 5 includes data terminals 1, 1' and ISDN Terminal Adapter 2, 2', which "carry out data transmissions between the terminals 1, 1', . . . and the ISDN 3." Cols. 2:31-36; 4:46-48.[16] These ISDN terminal adapters 2 and 2' correspond respectively to the first and second switches in the '902 patent claims. The first switch has access to two different switching networks though the ISDN network 3. The first is a line switching network that is enabled by "speed matching unit 24," which Matsukawa '411 states is "for a

---

[15] The Japanese priority document for the Matsukawa '411 US patent, identified as JP7-154426 (attached as Exhibit 30 hereto, and published in 1995), states: "The purpose of the present invention is to solve the above mentioned problems, and provide an ISDN terminal adapter that can automatically switch packet switching mode to circuit switching mode even when problems occur in the packet network or when data transmission delay time increases, preventing switching errors by the operator and shortening switching time." Exhibit 30 at ¶ 0011.

[16] It was well known by 1994 that data terminal equipment for ISDN networks could include telephones, as well as other data transmission equipment. See, e.g., Yoshida, US 5,347,516 at 2:8-14 (issued Sept. 13, 1994) ("System for access from LAN to ISDN with means for changing between use of packet switch and line-switch without interruption of data transmission," including data transmissions from digital telephones) (Exhibit 31). The Yoshida '516 patent is discussed further below.

circuit switching mode." Col. 2:41-42. The first switch also includes a packet switching network that is enabled by "packet processing unit 26," which Matsukawa '411 states is "for a packet switching mode." Col. 2:39-40. The packet processing unit 26, which is described in detail with reference to Figure 2, packetizes the data received from terminal 1 into data packets DT using the "packet assembly disassembly unit" (PAD) 231. Cols. 2:56-57; 5:22-26. In other words, the Protocol Processing Switching Unit selects between circuit switching through Speed Matching Unit 24 and packet switching through Packet Processing Unit 26, and the data is packetized if necessary in the Packet Processing Unit.

The operation of the system of Figure 5 is illustrated in Figure 6, which depicts the signaling taking place between data terminals 1 and 1' through ISDN Terminal Adapters 2 and 2' and ISDN 3.



- 50 -

The system first establishes packet switching communication between terminal 1 and 1' using the Packet Processing Unit 23. Col. 5:21-22.[17] This is shown as signals S1, CR, CN, S2, S4, CC, CA, S3, and S5 in Figure 6. ISDN Protocol adapter then begins transmitting data packets (DT), as shown in Figure 6.

To help manage the efficiency of the network, the '411 patent's system also includes a timer T2, which is used to determine when to switch between packet switching and circuit switching. When data packets DT are assembled, timer T2 is started as shown in Fig. 6. Col. 5:26-27. In normal operation, the second switch provides an "RR response" when the data is received, which resets timer T2. In abnormal operation, however, timer T2 exceeds a predetermined maximum time before an RR response is received and the timer "generates a switching request." Col. 5:34-41. This switching request is a control signal monitored by the Protocol Processing Switching Unit 22 in the first switch "to select the speed matching unit 24 instead of the packet processing unit 23, thus changing from data communication by packet switching to data communication by circuit switching." Col. 5:41-45 (emphasis added.) Such a control signal for a change-over to line switching is not produced by the user, but by the Timer T2 that assists in managing the network.

In summarizing the disclosure, Matsukawa virtually recites the elements of the '902 patent at issue in this reexamination request, stating:

> As explained hereinbefore, according to the present invention, when a fault is generated in the data communication by packet switching, or when a large

---

[17] The data packets DT are generated from the raw data from terminal 1 as follows. The Packet Processing Unit links the data to the ISDN with either a link access protocol balanced (LAPB) protocol unit 232 (Fig. 3) or a D-channel protocol unit, which correspond to the packet switching capabilities of the ISDN B-channel and ISDN D-channel, respectively. Cols. 2:59-64; 5:22-26. The data is packetized if necessary and then, the data packets DT are transmitted to terminal 1' through the ISDN 3. Col. 5:22-31.

LIBA/1819814.2

> amount of delay occurs in the transmission of data by
> packet switching, the data communication by packet
> switching is automatically changed to data communication
> by circuit switching.  Col. 6:52-57.

Thus, by the time the Applicants for the '902 patent conceived of their system,

Matsukawa had already described the problem and the solution in his application that led

to the '411 patent.

### f.    U.S. Patent No. 5,347,516 (Yoshida '516), Exhibit 31

U.S. Patent No. 5,347,516 (Yoshida '516) was filed on October 4, 1993, and

issued on September 13, 1994.  It is entitled:  "System for Access from LAN to ISDN

with Means for Changing Between Use of Packet Switch and Line Switch Without

Interruption of Data Transmission."  Yoshida '516 is prior art under 35 U.S.C. § 102(a)

and 102(b).

The patent describes and depicts the transfer of data from a plurality of terminal

equipments (TEs), including digital telephones, faxes, computers, etc., through an ISDN

access system or switch, to an ISDN network with packet switching and line switching

over different channels, to destination end terminals.  See, e.g., Figure 1 & Col. 1:20-24.

"[I]t is an object of the present invention to provide an ISDN access system from packet

data equipment such as a LAN which enables a change between a virtual circuit using a

packet switch in an ISDN switch and another virtual circuit using a line switch in the

ISDN switch without interruption of transmission of packet data."  Col. 2:8-14.  One

reason cited for needing the capability to make such a change is that "[u]se of the packet

switching in the virtual circuit is economical when a small number of data packets are

transmitted for a unit time, but degrade throughput of the data when an increased number

of data packets are transmitted for a unit time," i.e., when there is delay.  Col. 1:55-59.

- 52 -

The line switched connection, however, has the drawback that that it is "not economical when a decreased number of data packets are transmitted for a unit time." Id. at Col. 1:62-65.



FIG. 1

Figures 4 and 5 and the accompanying description in the text confirm clearly that the change over from packet switching of data on the B1 channel to line-switching of the data occurs during the same telephone call or communications connection, in response to a control signal that is generated by the control channel processor 27 in response to the channel changer 29, which is not from an end terminal phone or other equipment. See e.g., Col. 6:8-7:40. This change-over from packet switching to line switching, as caused by the system controller, enables the invention to improve the throughput of the data to the second end terminal and avoid problems associated with delay due to traffic on the packet system. See, e.g., Col. 1:55-2:5. Moreover, the change-over from packet switching of the transmission to line switching of the same transmission is carried out without interruption of the connection.

- 53 -

g.    **Lucent Technologies Press Release, Exhibit 8**

Exhibit 8 is a press release published by Lucent Technologies on September 17, 1996, and it is prior art to the '902 patent under 35 U.S.C. § 102(a).  In the press release, Lucent announced new "Internet telephony servers," through which customers "will be able to choose to route their fax and voice traffic through the Internet for cost savings, or through public or private networks for quality, reliability and security."  Calls could thus be routed through the packet-switched Internet, or through line-switched private networks, such as the PSTN.

The Lucent press release also describes how the "Internet telephony server will use industry standard connections, allowing multi-site, multi-vendor networks using any business telephone system. … The Internet telephony server routes fax and voice traffic from traditional telecommunications network to business intranets and the Internet."[18] "Any" existing telephone equipment would be useable with the server, thus including analog, digital and IP telephones.

The press release also discloses the ability to change-over from a packet switched telephone connection to a circuit switched connection in the middle of a call, for example, to avoid congestion that could affect the quality of calls on the Internet: "Eventually, the network management software will be able to transparently route traffic over either intra/Internet or the public network.  If the Internet was too congested, for instance, the server could switch the transmission back to the public network" This passage also highlights the ability of the server to monitor a transmission that was

---

[18] Various references described and made known to the art in general the overall operations of carrying out voice telephone calls over the internet.  See, e.g., White, U.S. Patent No. 6,069,890 (Exhibit 27) and Farris, U.S. Patent No. 6,125,113 (Exhibit 28).  The Schindler '902 patent does not purport to have invented Internet telephony or the manner of enabling telephone calls to be carried over packet switching networks such as the packet-switch portion of the ISDN or other packet networks such as ATM or frame relay networks.

originally sent over the Internet and switch "the transmission" -- i.e., the individual communications connection -- back to the public switched network at the direction of the network management software in the server.

### G.    ANTICIPATION OF THE CLAIMS BY THE PRIOR ART

The claims under reexamination are each anticipated by one or more of the references discussed above.  The following chart provides a "road map" for the anticipation arguments.

| Prior Art | Anticipated Claims of '902 Patent |
|---|---|
| U.S. Patent No. 5,610,910 (Focsaneanu '910) | 36, 37, 54, 55, 56, 57, 58, 61, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87, 90, 91, 92, 95, 98, 100, 102, 104, 118, 119, 120, 122, 123, 124, and 125 |
| U.S. Patent No. 6,137,792 (Jonas '792) | 36, 37, 54, 55, 60, 61, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87, 90, 92, 95, 98, 100, 102, 118, 120, 121, 122, 123, and 124 |
| U.S. Patent No. 4,996,685 (Farese '685) | 36, 41, 54, 55, 60, 62, 64, 68, 69, 71, 75, 77, 79, and 82 |
| U.S. Patent No. 5,732,078 (Arango '078) | 36, 37, 84, 90, 92, 98, 118, 120, 121, 122, 123, and 124 |
| U.S. Patent No. 5,598,411 (Matsukawa '411) | 36, 68, 69, 71, 75, 77, 79, and 82 |
| U.S. Patent No. 5,347,516 (Yoshida '516) | 36, 37, 54, 55, 56, 58, 62, 64, 68, 69, 71, 75, 77, 79, 82, 84, 87, 90, 92, 95, and 98 |

Invalidity based on a lack of novelty ("anticipation") requires that the same invention, including each element and limitation of the claims, was known or used by others before it was invented by the patentee.  *See Nystrom v. Trex Co.,* 374 F.3d 1105

- 55 -

(Fed. Cir. 2004). Novelty of a claim is judged by a simple comparison of the literal language of the scrutinized claim with a single piece of prior art. *See Verre, LLC v. Crane Cams Inc.,* 311 F.3d 1116 (Fed. Cir. 2002). A claim lacks novelty, and is thus not valid under 35 U.S.C. § 102, if every feature of that claim is found, either expressly or under principles of inherency, in a single prior art reference or document. *See Elmer v. ICC Fabricating, Inc.,* 67 F.3d 1571, 36 USPQ2d 1417 (Fed. Cir. 1995); *Dayco Products v. Total Containment Inc.,* 329 F.3d 1358 (Fed. Cir. 2003).

A reference anticipates a claim if it discloses the claimed invention "such that a skilled artisan could take its teachings in combination with his own knowledge of the particular art and be in possession of the invention." *See In re Graves,* 69 F.3d 1147, 36 USPQ2d 1697 (Fed. Cir. 1995) (citing *In re LeGrice,* 301 F.2d 929, 936, 133 USPQ 365, 372 (CCPA 1962); *In re Donohue,* 766 F.2d 531, 533, 226 USPQ 619, 621 (Fed. Cir. 1985)).[19] Extrinsic evidence may be used to explain the meaning that a reference would have had to one skilled in the art. *In re Baxter Travenol Labs.,* 952 F.2d 388, 390-91 (Fed. Cir. 1991).

Even where a reference does not disclose in words all the elements of a claim, it may be anticipating if a person of ordinary skill in the art would understand the reference as disclosing those elements, and if such a person could have combined the reference's teaching with his own knowledge to make the claimed invention. *Helifix, Ltd. v. Blok-Lok, Ltd.,* 208 F.3d 1339, 1347 (Fed. Cir. 2000); *Continental Can Co. U.S.A. v. Monsanto*

---

[19] Anticipation requires just a single, complete disclosure of the invention in the reference. If one complete example anticipates, the disclosure need not draw attention to or agree with the anticipating example. *See Medichem SA v. Rolabo S.L.,* 353 F.3d 928 (Fed. Cir. 2003) (citing *Titanium Metals Corp. v. Banner,* 778 F.2d 775, 782, 227 USPQ2d 773 (Fed. Cir. 1985) (one graph data point out of fifteen from the prior art reads on the claims at issue, thereby anticipating them)).

*Co.*, 948 F.2d 1264, 1268, 20 USPQ2d 1746, 1749 (Fed. Cir. 1991) ("To serve as an anticipation when the reference is silent about the asserted inherent characteristic, such gap in the reference may be filled with recourse to extrinsic evidence"). This principle of filling the "gap" by showing inherent properties of an anticipating reference through extrinsic evidence also does not offend the requirement that reexamination be based on patents or printed publications. "Affidavits or declarations which explain the contents or pertinent dates of prior patents or printed publications in more detail may be considered in reexamination . . . ." *See* MPEP § 2258.

Details of the anticipation of the various claims by each of the references is provided in the following charts, on a claim-by-claim basis:

**CHARTS AVAILABLE UPON REQUEST**

### H.    OBVIOUSNESS IN VIEW OF THE PRIOR ART – OVERVIEW

#### 1.    The Law of Obviousness

Recent decisions by the United States Supreme Court, the Federal Circuit, and the Board of Patent Appeals and Interferences have reviewed and strengthened the standards for determining when a claimed invention is invalid as obvious. The Board's decision in *Ex Parte Catan*, 2007 WL 1934867 (July 3, 2007) at \*9, quotes the Supreme Court's decision in *KSR Int'l Co. v. Teleflex, Inc.,* 127 S.Ct. 1727, 1734 (2007), as reaffirming that "Section 103 forbids issuance of a patent when 'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." *See* 35 U.S.C. § 103(a) (1994); and *Graham v. John Deere Co.*, 383 U.S. 1, 13-14 (1966).[20] The ultimate determination of whether an invention is or is not obvious is a legal conclusion based on underlying factual inquiries including: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness. *See Graham*, 383 U.S. at 17-18; and *Miles Labs., Inc. v. Shandon Inc.*,

---

[20] Similar conclusions were reached by the Board in *Ex parte Smith*, 2007 WL 1813761 (June 25, 2007) at \*8-11, which also upheld the Examiner's final rejection of proposed claims on obviousness grounds.

LIBA/1819814.2

*997 F.2d 870, 877 (Fed. Cir. 1993).* As acknowledged in *Ex Parte Catan*, the Supreme Court emphasized in *KSR* "the need for caution in granting a patent based on the combination of elements found in the prior art." 127 S. Ct. at 1739, quoted in *Catan* at *10. The Supreme Court also stated that "[t]he combination of familiar element according to known methods is likely to be obvious when it does no more than yield predictable results." Id. The Court explained:

> "When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, §103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." Id. at 1740.

As the Board stated in *Ex Parte Catan,* "[t]he operative question in this 'functional approach,' is thus 'whether the improvement is more than the predictable use of prior art elements according to their established functions.'" *Catan* at *10, quoting 127 S.Ct. at 1740. While a rejection on obviousness grounds must have an articulated reasoning with some rational underpinning, the "analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." Id. at *11, quoting 127 S.Ct. at 1741.[21]

---

[21] The Board in *Ex Parte Catan* also cited the Federal Circuit's recent decision in *Leapfrog Ent., Inc. v. Fisher-Price, Inc.,* 485 F.3d 1157, 1161 (Fed. Cir. 2007), as an example of the application of Section 103. See *Catan* at *12. The Federal Circuit in that case concluded that it would have been obvious to combine (12) a mechanical device for actuating a phonograph to play back sounds associated with a letter in a word on a puzzle piece with (2) an electronic, processor-driven device capable of playing the sound associated with a first letter of a word in a book. Id.

In *Ex Parte Catan*, the Board went on to apply these standards to find a claimed invention obvious based on the combination of prior art. Again, the Board cited *KSR*: "Where, as here '[an application] claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result.'" *Catan* at *17, citing 127 S.Ct. at 1740. Likewise, in the case of *Ex Parte Smith*, 2007 WL 1813761, the Board upheld the Examiner's final rejection of claims on the ground that the proposed claims "were combinations which only unite old elements with no change in their respective functions and which yield predictable results." *Smith* at *21.

### 2. Obviousness of the '902 Claims in this Case and the Motivation to Combine

Here, to the extent that the various anticipatory references cited above fail to disclose any element of the various claims, the claims are nonetheless obvious under Section 103 because all of the elements of the claimed inventions were disclosed in one or more of the other references and it would have been readily within the skill of the person of ordinary skill in this art to unite the various elements to obtain the predictable results from the combination. Indeed, as noted above, even the patentees acknowledged in the specification that "[t]he technologies used are known per se." '902 patent at Col. 6:56. Notably, the patentee never claimed as novel the various features of packet or line switching, of the ISDN, of the Internet, of Internet telephony, or of the end terminal telecommunications devices (e.g., ISDN or analog telephones) that are used and depicted in the patent as being part of well known packet and line switching networks. Even the "switch according to the invention" shown in Figure 4 of the '902 patent is admitted by

the '902 inventors to be a combination of known switch elements.  See, e.g., '902 patent at Col. 8:25-58.

The motivation to make the proposed combinations to obtain the claimed invention is clearly present in the art as well.  As noted in the Overview above and in the discussion of the various prior art references, the reasons for causing a packet-switched communication to change over to line switching during an ongoing connection were cited in various references, and they applied equally to the attempt to route telephone calls over the Internet or over the PSTN.  The '902 patent cites as reasons for the need for a "dynamic" changeover the fact that "[l]ine-switching connections are expensive" (Col. 1:56) and that packet-switching over the Internet is subject to "delays [that] are of considerable significance" (Col. 2:18) due to congestion and blockages.  The '902 invention supposedly provides "flexible data transfer between the switches and more particularly cost-effective data transfer with real time properties."  Col. 3:22-23.

Precisely these motivations were at issue in the prior art references cited above. The Focsaneanu '910 patent and the Lucent Press Release, for example, specifically mention these factors in the context of dynamic change-overs for telephone calls initially made through the Internet.  See also Arango '078 at col. 3:23-31 & 48-51 ("the Internet 100 does not provide any mechanism to the hosts h1-h10 for controlling or predicting the end-to-end time interval for completing the communication …  At times of high congestion … packets will be buffered for longer periods of time and incur high delays. …  This presents a problem for 'time-sensitive' communications," such as text, audio video etc. "). The earlier references (Farese, Yoshida and Mastukawa) each also describe the same factors and motivations in applying change-over switching in the then-emerging

technology of ISDN and broadband ISDN.  See, e.g,. Farese '685, Col. 2:4-2:32[22] .  What Schindler, et al., now claim to have invented, in fact was previously invented and well known and disclosed in the art.

Indeed, one of the earlier references, the Farese '685 patent, moreover, not only identifies the common motivation for making the change-over between packet and line switching, but also specifically spells out that the dynamic change-over described there could readily be applied to *other* networks that have "two or more separate communication connections that have different attributes, such as illustratively throughput, transport delay or cost of use."  Farese '685 at Col. 9:35-43.  This passage and others from the art references themselves provide specific motivation to expand the teachings of the individual references, if necessary, to the particular context and features claimed in the '902 patent.

Finally, as noted earlier, the prosecution history of the '902 and its parent application are notable for the lack of discussion of potential obviousness combinations. The kind of analysis required by the Board and the Supreme Court and Federal Circuit in the recent decisions should be applied here to find the '902 claims obvious.

---

[22]  "Due to the substantial differences between the two different types of ISDN connections, circuit switched and packet switched connections each provides different advantages and drawbacks. First, a circuit switched connection provides a continuous transmission path from the caller to the called party throughout the duration of a call. Such a connection imparts relatively little, if any, transmission delay to any communication carried over the path. Therefore, circuit switched connections are used in those communication applications, such as illustratively conversational voice traffic or highly interactive data traffic, where any appreciable transmission delay can not be tolerated. Second, circuit switched connections provide higher throughput than do many packet switched networks, such as specifically X.25 type packet switched networks. As such, communications applications that require a high throughput and low delay transmission path, such as illustratively real-time transfer of large files or transfer of high density digitized images, are ideal for transport over circuit switched connections. Unfortunately, since only one call, at least from the standpoint of a local switch and apart from any user multiplexing, can be carried over a given circuit switched connection through the network from a caller to a called party, use of a circuit switched connection tends to be quite expensive particularly if the connection is to be maintained over a prolonged period of time." Farese, 2:4-2:32.

Details of the obviousness of the various claims by each of the combination of references is provided in the charts provided below, on a claim-by-claim basis.

LIBA/1819814.2

**CHARTS AVAILABLE UPON REQUEST**

## I.    CERTIFICATION OF SERVICE ON PATENTEE

It is certified that a copy of this *Inter Partes* Reexamination Request has been served in its entirety on the patent owner as provided in 37 CFR § 1.33(c) on August 8, 2007. The name and address of the party served is as follows: Vincent M. DeLuca and Richard C. Auchtertonie, Novak, Druce, DeLuca & Quigg LLP, 1300 I Street, N.W., Suite 400 East Tower, Washington, D.C. 20005,  A courtesy copy is being sent to Matthew J. Moore, Howrey LLP, 1299 Pennsylvania Ave., N.W., Washington, D.C. 20004.

LIBA/1819814.2

**J.    CERTIFICATION THAT ESTOPPEL DOES NOT PROHIBIT THE PRESENT *INTER PARTES* REEXAMINATION**

It is certified that the estoppel provisions of 37 CFR 1.907 do not prohibit this reexamination.

**K.    STATEMENT IDENTIFYING THE REAL PARTY IN INTEREST**

The real party in interest is the Requestor, Cisco Systems, Inc., a Delaware corporation.

**L.    REQUESTOR'S CORRESPONDENCE ADDRESS**

Direct all communications in this matter to the Requestor at the following address:  Byron Cooper, Goodwin Procter LLP, Exchange Place, Boston, MA 02109.

**M.    CONCLUSION**

Substantial new questions of patentability of claims 36, 37, 41, 54-58, 60-62, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87, 90-92, 95, 98, 100, 102, 104, and 118-125 of the '902 patent is raised in view of the art cited and discussed above.

Accordingly, the Requester respectfully submits that reexamination of the Schindler '902 patent is warranted in view of the showing in this Request that substantial new questions of patentability are presented.  Early notice of the grant of this Request is earnestly solicited.

Respectfully submitted,

CISCO SYSTEMS, INC.

Electronic signature:  /Byron Cooper/
Byron Cooper
Registration No. 39,484

Customer No. 051414

Date:  August 8, 2007

LIBA/1819814.2

## Certificate of Service Under 37 C.F.R. § 1.248

I hereby certify that a true copy of the attached Request for Inter Partes Reexamination and any related papers being filed therewith was served upon the attorney of record for the reexamination requestor, by first-class mail addressed to Novak, Druce, DeLuca & Quigg LLP, 1300 I Street N.W., Suite 400, East Tower, Washington, D.C. 20005, on August 8, 2007.

Respectfully submitted,

Date:  August 8, 2007

Electronic signature:  /Byron Cooper/
Byron Cooper
Authorized Signature For Third Party Requester
Reg. No. 39,484

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | |
| **Filing Date:** | |
| **Title of Invention:** | Method for Transmitting Data in a Telecommunications Network and Switch for Implementing Said Method |
| First Named Inventor/Applicant Name: | Sigram Schindler |
| **Filer:** | John V. Forcier |
| **Attorney Docket Number:** | CCO-001REX |
| Filed as Large Entity | |

## inter partes reexam Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| Request for inter reexamination | 1813 | 1 | 8800 | 8800 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| Post-Allowance-and-Post-Issuance: | | | | |
| **Extension-of-Time:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **8800** |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 2063100 |
| **Application Number:** | 95001001 |
| **International Application Number:** | |
| **Confirmation Number:** | 2435 |
| **Title of Invention:** | Method for Transmitting Data in a Telecommunications Network and Switch for Implementing Said Method |
| **First Named Inventor/Applicant Name:** | Sigram  Schindler |
| **Customer Number:** | 51414 |
| **Filer:** | John V. Forcier |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | CCO-001REX |
| **Receipt Date:** | 08-AUG-2007 |
| **Filing Date:** | |
| **Time Stamp:** | 18:36:00 |
| **Application Type:** | inter partes reexam |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment was successfully received in RAM | $ 8800 |
| RAM confirmation Number | 9485 |
| Deposit Account | 071700 |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes) /Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

| 1 | Reexam - Information Disclosure Statement Filed by Third Party Requester | NewIDS_pdf_pdf.pdf | 8343148<br><br>7d69afb804281dfe80a2a5caa11e23e2f<br>afdc6c7 | no | 119 |
|---|---|---|---|---|---|
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh2pdf.pdf | 13846721<br><br>9dea5a88e370d11ea7acbcbaf22096c7<br>f6e6f99b | no | 276 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 3 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh3pdf.pdf | 957154<br><br>711dbd058253a3c19fc0ac9b2c25b2afa<br>1c51493 | no | 21 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 4 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh4pdf.pdf | 1021759<br><br>6deeb341a23a5c871caaa14d0f408b6a<br>f3ba3006 | no | 23 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 5 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh11pdf.pdf | 162967<br><br>10e7516834d9ccca01c0548fb046b7df0<br>f3b0a8b | no | 5 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 6 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh12pdf.pdf | 542894<br><br>cde132acd4910a746875b3ab69f4324b<br>c8a7b60e | no | 14 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 7 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh13pdf.pdf | 197736<br><br>dea92599ecfea127e4ef84543db09ade<br>c6894383 | no | 6 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 8 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh14pdf.pdf | 686845<br><br>1976f06978fea7eaaceada90139d55f11<br>522c186 | no | 19 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 9 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh15pdf.pdf | 430490<br><br>92993703345f63c9cdd8a7cb995af984<br>33b9543e | no | 11 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |

| 10 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh16pdf.pdf | 997556 <br> d086ae187850a0bc1f5ed9b11c5112fa e4076a6c | no | 27 |
|---|---|---|---|---|---|
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 11 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh17pdf.pdf | 744757 <br> 7a6575e3c8fc4e3290a009b6096e420a d8881e93 | no | 18 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 12 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh18pdf.pdf | 924752 <br> ce0c4d2199bcc5fa3fc7c88od3a31dbed f232238 | no | 27 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 13 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh19pdf.pdf | 165254 <br> 5ad1a3e19d4d007701bf840fd2cc989c 25432e48 | no | 5 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 14 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh20pdf.pdf | 167441 <br> be38b0d4b301f17f056f110517cea5018 67e418d | no | 5 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 15 | Copy of patent for which reexamination is requested | Exh1pdf.pdf | 1869420 <br> ff73cb196639b487fa8edb795c9543a48 fa21178 | no | 23 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 16 | Reexam Miscellaneous Incoming Letter | Transmittal_1_DOC.pdf | 44498 <br> 8d64056f0ba14a4029df22f94c56abe2e a4c8124 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 17 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh21pdf.pdf | 45686 <br> f220880cda1a1ed6383756187c1c6173 e5e54b50 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 18 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh22pdf.pdf | 322869 <br> 0904a453fa34501e00544eafd19a9404 1853406d | no | 8 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |

| 19 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh23pdf.pdf | 1294887<br><br>b9b0da2b277e736486f43958b7db9722<br>7f503b7d | no | 29 |
|----|---|---|---|---|---|

**Warnings:**

**Information:**

| 20 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh24pdf.pdf | 2279804<br><br>7f8648ca03e464684b6a160bff685d897<br>c5a61da | no | 42 |
|----|---|---|---|---|---|

**Warnings:**

**Information:**

| 21 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh25pdf.pdf | 352076<br><br>00435f4a1d2e30b4f03991c6804f64541<br>738da6c | no | 8 |
|----|---|---|---|---|---|

**Warnings:**

**Information:**

| 22 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh26pdf.pdf | 349057<br><br>b98a00ac0a0acdad95f5a59a459d421e<br>1234ab16 | no | 8 |
|----|---|---|---|---|---|

**Warnings:**

**Information:**

| 23 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh27pdf.pdf | 1494097<br><br>a79abd611c19c4eb744ddd19de08366<br>6e83af061 | no | 22 |
|----|---|---|---|---|---|

**Warnings:**

**Information:**

| 24 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh28pdf.pdf | 1982613<br><br>b57c27fcd377aea2ce240a3cd2011efdc<br>8e9ff09 | no | 31 |
|----|---|---|---|---|---|

**Warnings:**

**Information:**

| 25 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | Exh29pdf.pdf | 1438355<br><br>476025086721638ef76a94b6b68a0a25<br>f994ff92 | no | 16 |
|----|---|---|---|---|---|

**Warnings:**

**Information:**

| 26 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester | 30PDF.pdf | 836006<br><br>0eb6b1a2a231bea90f5f5b918f70ca760<br>9ac49c2 | no | 15 |
|----|---|---|---|---|---|

**Warnings:**

**Information:**

| 27 | Receipt of Original Inter Partes Reexam Request | RequestforInterPartesReexamination.pdf | 9040194<br><br>87151b311a8295907bc8c192086e188<br>d4b235d4b | no | 647 |
|----|---|---|---|---|---|

**Warnings:**

**Information:**

| 28 | Reexam Certificate of Service | certofservice.pdf | 17379<br><br>3139ba5a84e3c1e15340d27fef9462ee<br>2b9c8d52 | no | 1 |
|----|------|------|------|----|----|

| **Warnings:** |
|---|
| **Information:** |

| 29 | Fee Worksheet (PTO-06) | fee-info.pdf | 8158<br><br>38d8f3745058687c7b87a141e0f34d37<br>414d4772 | no | 2 |
|----|------|------|------|----|----|

| **Warnings:** |
|---|
| **Information:** |

| **Total Files Size (in bytes):** | 50564573 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.