# EXHIBIT 11

purpose for his insisting upon that, and probably a good idea, was to ensure that independent inventors are not without a voice in the oversight of the operation of the PTO as far as sitting on one of the boards is concerned.

Ms. LOFGREN. Finally at this point, Mr. Speaker, I note that one change that I think I support but I have some concerns about is that the Patent and Trademark Office would be authorized to publish documents electronically. That makes sense, but because of the lack of vigorous encryption involved in the world and in government offices, I do have concerns as to the security of such publication. I do not know whether that can be addressed in the bill, but I do want to raise the issue, and my 5 minutes is expired. I want to reserve the time for the gentlewoman from Ohio (Ms. KAPTUR), so I will leave that out for a later answer.

Mr. COBLE. We will get to that substantively.

Mr. Speaker, I yield 5 minutes to the gentleman from California (Mr. ROHRABACHER).

Mr. ROHRABACHER. Mr. Speaker, I rise in strong support of H.R. 1907, as amended. This bill is the culmination of a long process of negotiations that followed floor battles in the last Congress between the leadership of the Committee on the Judiciary and a group of Members led by myself. It was far more than sausage making because we have people with honest beliefs on both sides, and I certainly can see where people can have honest differences on something as complicated as patent law.

I began this fight in 1994 when I fought against provisions that were inserted into the GATT trade agreement implementation bill to eliminate our Nation's traditional guarantee of a 17-year patent term in an attempt to harmonize our patent law with those of other nations with a 20-year-from-filing limit that was imposed through that legislation, thus taking away a guaranteed patent term that had been the right of every American inventor. This change, by the way, would have resulted in decreasing the patent term of every application held in the Patent Office for more than 3 years, which is a common occurrence with breakthrough technologies.

I was further energized in this fight when additional changes in our patent system were proposed, including the publishing of all patent applications 18 months after filing, even when no patent had been issued, and establishing prior user rights for all inventions, opening up new opportunities to challenge already-granted patents through reexamination and the turning of the Patent Office into a government corporation. These things caused me great pain and concern.

The battles we had ultimately resulted in a standoff in the Senate in which no patent legislation was adopted, and I am pleased to note that the negotiations I referred to earlier have resulted in a bill that is very much different than the patent bills that went through the Committee on the Judiciary last year and the fights we have had in the last 4 years.

Instead of making minor, tenuous extensions in the patent term, H.R. 1907 goes most of the way in reversing the 1994 patent term reduction by extending patent term completely to compensate for delays in the processing of the Patent and Trademark Office or any other delay resulting from actions taken by anyone else other than the patent applicant. Instead of publishing all patent applications after 18 months, 1907 publishes only, only the pending applications that have been published abroad, and thus they are already published and already known to the people and only to the extent that they are published abroad.

Instead of a prior user defense that applies to all inventions which we just heard a question about a moment ago, H.R. 1907 contains a very limited prior user defense that applies only to those business methods which have only been considered patentable in the last few years, and this, of course, flows from an adverse case before the court that changed patent law.

We want to have our say in what is going on here, and we are correcting it in this legislation; and instead of corporatizing the Patent Office and removing civil service protection from patent examiners, H.R. 1907 leaves the PTO as an agency within the Department of Commerce while including valuable provisions keeping patent revenue within the Patent Office and providing for enhanced training and professional development for patent examiners and retaining their civil service status.

Mr. Speaker, although as in all compromises both sides have to give up something, maybe a little, I would say that my Committee on the Judiciary colleagues will not mind that I am stating for the RECORD that I believe that H.R. 1907 represents a major victory for the independent inventor whose interests I have vigorously defended these past 5 years.

I ask my colleagues to give H.R. 1907 their overwhelming support and to join me in urging the other body to take up this compromise as is and send it to the President for his signature without change.

Mr. Speaker, I have some more detailed comments, and I will be inserting them at this point in the RECORD, but I would not want to let this moment go by without thanking the gentleman from North Carolina (Mr. COBLE) who has, as my colleagues know, stepped forward in a spirit of compromise, and we have worked really hard on this; the gentleman from Illinois (Mr. HYDE) who also played an important role in this. Their spirit of goodwill and the negotiations we have had have resulted in a superior bill that is going to do great things for America and to keep us technologically ahead.

I also thank the gentleman from Illinois (Mr. MANZULLO). In his late-breaking contributions to this fight he has greatly improved this legislation, and he can be justly proud he has done a good job for America in doing so. Finally, I would like to thank the gentleman from California (Mr. CAMPBELL) and the gentlewoman from Ohio (Ms. KAPTUR), and Ms. KAPTUR has been deeply involved in these negotiations from the beginning.

Ms. KAPTUR has been very deeply involved in this whole fight from the very beginning, and over the last 4 years she stood firm with us, and in fact in the last month we have had meetings in her office trying to negotiate these details out. We have been working with her staff, and I do not know, it sounds like we have not satisfied all of her concerns, but she has certainly played an important role in this process, and the gentleman from Ohio (Mr. KUCINICH) and the gentleman from California (Mr. HUNTER).

All of these people played such a significant role along with, of course, the gentleman from North Carolina (Mr. COBLE) and the gentleman from Illinois (Mr. HYDE) in giving us this incredible piece of legislation that I believe is going to do great things for America. Also, my staff members Rick Dykema and Wayne Paugh and other science fellows who worked with me, Paul Crilly, John Morgan, Biff Kramer, Dick Backe and Richard Cowan, for all the hard work they have put in on this piece of legislation.

I urge my colleagues to support it.

Mr. Speaker, for the last several years, this is a day I had hoped would come. I have fought long and hard to protect the products of our nation's independent inventors. I have fought diligently to strengthen our patent system and to prevent changes in the name of harmonization. Now, after the continued competition and polarization of the past, this was finally a time for cooperation. Chairman COBLE and I have both spent many hours of individual effort pursuing our respective goals for patent reform the past several years, and indeed the time was ripe to work together toward a unified effort. It was time to have an open-ended process in which everyone had an opportunity to come to the table.

With that, I am proud to say that after a long and successful negotiation period with my friend from North Carolina, Chairman COBLE, and with the invaluable help of my fellow colleague from California, Mr. CAMPBELL and with late-breaking help from my friend from Illinois, Mr. MANZULLO, we were finally able to reach agreement on the issues. As was always the case, the devil has been in the details. Therefore, this has been a carefully crafted effort, but has resulted in a resounding victory for the United States patent system and the American inventor.

TITLE II—FIRST TO INVENT DEFENSE ACT

With regard to Title II, the First Inventor Defense, I have always held that we simply cannot champion trade secret protection over patent protection for clearly patentable subject matter. We cannot betray our Founding Fathers by abandoning the foundation upon which our patent system is based. We cannot

openly advocate secrecy when our patent system calls for us to vigorously promote the progress of science through the sharing of critical technology.

In the patent bill that passed the House last year, all patents were subjected to prior user rights. This Congress, we were initially able to limit this title to processes and methods only. More recently, however, we were able to even further limit this section to business methods only. This is an important limitation in scope to take note of because now Title II will not affect the vast majority of independent inventors and small businesses.

A first inventor defense that is strictly limited to business methods will severely reduce its applicability. Furthermore, the defense applies only to business methods that have been reduced to practice at least one year prior to the effective filing date of the patent in question. Even further, to successfully use this defense a litigant must satisfy a clear and convincing evidentiary standard and risk being subjected to paying reasonable attorney fees to the prevailing party. Bottom line, the best defense to a charge of patent infringement will remain the successful assertion of invalidity, and not a first inventor defense.

### TITLE III—PATENT TERM GUARANTEE ACT

My goal all along has been to assure a minimum patent term of 17 years from the date a patent is granted. Failing that, I have insisted on a guarantee that the PTO will extend the patent term as necessary to assure a term of 17 years from filing for non-dilatory applicants. The language of this bill clearly codifies this approach.

As everyone is aware, the current law governing patent term is 20 years from the date of file. Since June 8, 1995, when the 17-years-from-grant was changed, patents have been losing precious time under the current law. Inventors can no longer rely on a guaranteed term of protection. In some cases, several years of effective post-grant protection is lost due to Patent and Trademark Office (PTO) administrative delay. This title represents an opportunity to recapture some of the reliance of pre-GATT standards.

By codifying what constitutes PTO delay, this title can compensate the patent applicant for lost time on a day-for-day basis without time limitation. Furthermore, if the PTO does not issue a patent within 3 years from the date of original file, the patent term will be compensated day-for-day until the patent issues, minus any time the applicant has delayed prosecution by engaging in dilatory behavior.

This approach effectively eliminates the claimed submarine patent dilemma while providing a specific framework from which the Patent and Trademark Office must monitor and compensate the loss of any patent term due to delay for which the applicant has no responsibility.

This approach essentially gives back to the non-dilatory patent holder what I have fought so hard for—a guaranteed 17 year patent term. The patentee once again will have the right to exclude the public from using his invention for a limited time—a time that is guaranteed and clearly defined. This Title essentially regains what GATT gave away. It has been my core initiative and now I am proud to say that it is my most significant success in this bill.

### TITLE IV—PUBLICATION OF FOREIGN APPLICATIONS ACT

As I supported last year, this bill includes a provision similar in spirit to the amendment successfully offered last year to H.R. 400 by my friend from Ohio, MARCY KAPTUR. Essentially, this year's effort only permits early publication of U.S. patent applications that are filed abroad in a country that also publishes early. Additionally, the U.S. application will not be published before the foreign application, and in no greater content.

Curiously, this title has generated an abundance of controversy, although its provisions are of a positive nature. There are over 170 patent systems that currently exist globally. Our nation cannot control foreign policies on early publication. A majority of foreign nations choose to publish patent applications prior to granting a patent. The published patent application is also normally printed in the home language of each respective foreign patent system.

Generally, this title will affect large corporations, because they are more likely to file abroad than the independent inventor community. Since American patent applications filed abroad are indeed published early and are in a foreign language, foreign nations have a chance to view them at their leisure. This is the reality and the argument from the other side in the last Congress that was the hardest to counter.

Thus we have agreed to permit the PTO to publish after 18 months only those applications that are filed internationally. If an applicant files an application only domestically, he will have the unqualified right to maintain confidentiality of his patent application. If an applicant files abroad and domestically, he will have the right to limit the content of early domestic publication to that content which the foreign entity has published. In no event will America publish prior to the actual publication date in a foreign patent system. It's that simple.

Also included, for those applications published early, is a provisional right which allows the patent holder to recover royalties for infringement activity during the pre-issuance period. There will also be no pre-issuance 3rd party opposition to the patent application permitted. Finally, the costs derived from early publication will be applied only to those applicants who are actually subjected to publication.

Essentially, this title is reactive to circumstances beyond our control already present in many foreign patent systems, while going to lengths to protect the American inventor community.

### TITLE V—PATENT LITIGATION REDUCTION ACT

Considering both the patent holder and third party, reexamination is a seldom used process in proportion to the number of patent applications filed each year. Yet, when Congress originally enacted the reexamination statute it had an important public purpose in mind: to restore confidence in the validity of patents issued by the PTO.

Specifically, three principal benefits were noted: 1. Resolve patent validity disputes more quickly and less expensively than litigation; 2. Permit courts to defer issues of patent validity to the expertise of the PTO; and 3. Reinforce investor confidence in the certainty of patents.

Reexamination was enacted as an important step to permitting the PTO to better serve the public interest. As the Supreme Court stated in Graham v. Deere, "it must be remembered that the primary responsibility for sifting out unpatentable material lies in the Patent Office. To await litigation is—for all practical purposes—to debilitate the patent system."

The current statute permits any patent holder or third party to submit prior art in the form of prior patents and printed publications throughout the term of the patent for the PTO to determine whether a substantial new question of patentability exists. Reexam procedures currently limit a third party's participation to arguing why there is a substantial new question of patentability.

This title was an attempt to provide an alternative to existing law and to further encourage potential litigants to use the PTO as a avenue to resolve patentability issues without expanding the process into one resembling courtroom proceedings. Fundamentally, in addition to the reexam process in law today, this title creates an additional reexam option that permits a 3rd party requestor to file additional written briefs. The price paid by those who would challenge a patent, however, is that the 3rd party requestor is barred from any appeals outside of the PTO and from subsequently litigating the same issues in a district court or making a second reexam request. This estoppel is the insulation that effectively protects patent holders.

Ultimately, the expanded reexam option does not subject the patent to any greater challenge in scope than currently exists today. It merely allows a reexam requestor the option to further explain why a particular patent should not have been granted.

Mr. Speaker, this bill does not create new opportunities to pursue litigation and does not create additional ways to invalidate patents. In fact, the bill seeks to provide even further ways to reduce the incentive for litigation in the courts and to protect against the needless wasting of dollars independent inventors don't have.

### CONCLUSION

Certainly, last year's bill was an exercise in harmonization brought about by the interests of large corporations. In contrast, this year's bill, H.R. 1907, is designed to protect the products of our nation's inventors and to help sustain our unprecedented technological leadership. I saw to that through many intense negotiations with my colleagues. Unfortunately, there are still those who cannot recognize victory even when it stares them in the face.

I assure you, Mr. Speaker, that if H.R. 1907 was similar to either H.R. 400 or S. 507 last Congress, my views would not have changed this Congress. But that is not the case. H.R. 1907 is a brand new effort reached through an open-ended and fair debate, and it is a bill I am unequivocally supporting today. It is also a bill that I will stand firmly behind as it moves through the Senate.

I know it is up to Congress to carry on the tradition of Thomas Jefferson, Benjamin Franklin, and the will of our Founding Fathers. It was they who provided our newly formed nation with a foundation for freedom and the power to protect the achievements of our inventors.

I have been intimately involved in these issues because I want to ensure that our patent system continues to respect the fundamentals of our Founding Fathers while at the same time enhancing its operability in modern society. We have a chance this Congress to enhance a system that better provides a stronger protection for our nation's inventors.