# EXHIBIT 5

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

PATENT:                          6,954,453

DATE OF ISSUE:                   October 11, 2005

DATE OF FILING:                  Filed as a PCT application on October 7, 1997, based
                                 on German patent applications filed on October 7, 1996
                                 and October 23, 1996

PATENTEE:                        Sigram Schindler et al.

TITLE                            METHOD FOR TRANSMITTING DATA IN A
                                 TELECOMMUNICATIONS NETWORK AND
                                 SWITCH FOR IMPLEMENTING SAID METHOD.

Mail Stop:  EX PARTE REEXAMINATION
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## REQUEST FOR *EX PARTE* REEXAMINATION OF
## U.S. PATENT NO. 6,954,453

**TABLE OF CONTENTS**

I.      CLAIMS FOR WHICH REEXAMINATION IS REQUESTED
        AND DISCLOSURE OF CONCURRENT LITIGATION ............................................1

II.     BRIEF OVERVIEW .........................................................................................2

III.    DESCRIPTION OF THE '453 PATENT ..........................................................7

IV.     PROSECUTION OF THE '453 PATENT .......................................................11

V.      OVERVIEW OF THE PRIOR ART...................................................................16

        A.    U.S. Patent No. 5,610,910 (Focsaneanu '910), Exhibit 2 ...................16

        B.    U.S. Patent No. 6,069,890 (White '890), Exhibit 3 .............................25

        C.    U.S. Patent No. 6,137,792 (Jonas '792), Exhibit 4 .............................28

        D.    U.S. Patent No. 4,996,685 (Farese '685), Exhibit 5 ...........................32

        E.    Lucent Technologies Press Release, Exhibit 6 ....................................37

VI.     STATEMENT POINTING OUT EACH SUBSTANTIAL NEW
        QUESTION OF PATENTABILITY ...............................................................38

VII.    DETAILED EXPLANATION OF PERTINENCE AND MANNER OF
        APPLYING CITED PRIOR ART TO EVERY CLAIM FOR WHICH
        REEXAMINATION IS REQUESTED ...........................................................43

        A.    Anticipation Of The Claims By The Prior Art......................................43

              1.    Detailed Explanation and Claim Analysis ('453 Patent Claim 34) ........45

                    '453 Patent Claim 34 is anticipated under 35 U.S.C. § 102(e) by
                    U.S. Patent No. 5,610,910 ("Focsaneanu '910").....................................45

                    '453 Patent Claim 34 is anticipated under 35 U.S.C. § 102(e) by
                    U.S. Patent No. 6,069,890 (White '890)....................................................51

              2.    Detailed Explanation and Claim Analysis ('453 Patent Claim 35) ........57

                    '453 Patent Claim 35 is anticipated under 35 U.S.C. § 102(e) by
                    U.S. Patent No. 5,610,910 (Focsaneanu '910)........................................57

              3.    Detailed Claim Analysis ('453 Patent Claim 36) ...................................59

'453 Patent Claim 36 is anticipated under 35 U.S.C. § 102(e) by U.S. Patent No. 5,610,910 (Focsaneanu '910).........................................59

'453 Patent Claim 36 is anticipated under 35 U.S.C. § 102(e) by U.S. Patent No. 6,069,890 (White '890)...................................................60

4.    Detailed Claim Analysis ('453 Patent Claim 38) ...................................61

'453 Patent Claim 38 is anticipated under 35 U.S.C. § 102(e) by U.S. Patent No. 5,610,910 (Focsaneanu '910).........................................61

'453 Patent Claim 38 is anticipated under 35 U.S.C. § 102(e) by U.S. Patent No. 6,069,890 (White '890)...................................................61

B.    Obviousness In View Of The Prior Art – Overview............................................62

1.    The Law of Obviousness ........................................................................62

2.    Obviousness of the '453 Claims in this Case and the Motivation to Combine................................................................................................64

3.    Detailed Claim Analysis ('453 Patent Claim 34) ...................................68

Claim 34 of the '453 patent is obvious under 35 U.S.C. § 103(a) over Focsaneanu '910 in view of Jonas '792, and further in view of Lucent ........................................................................................68

Claim 34 of the '453 patent is obvious under 35 U.S.C. § 103(a) over Focsaneanu '910 in view of Farese '685, and further in view of Lucent ........................................................................................83

Claim 34 of the '453 patent is obvious under 35 U.S.C. § 103(a) over White '890 in view of Jonas '792, and further in view of Lucent ..............................................................................................106

Claim 34 of the '453 patent is obvious under 35 U.S.C. § 103(a) over White '890 in view of Farese '685, and further in view of Lucent ..............................................................................................121

4.    Detailed Claim Analysis ('453 Patent Claim 35) ...................................144

Claim 35 of the '453 patent is obvious under 35 U.S.C. § 103(a) over Focsaneanu '910 in view of Jonas '792, and further in view of Lucent ........................................................................................144

LIBA/1826077.1

Claim 35 of the '453 patent is obvious under 35 U.S.C. § 103(a) over Focsaneanu '910 in view of Farese '685, and further in view of Lucent .............................................................................................148

Claim 35 of the '453 patent is obvious under 35 U.S.C. § 103(a) over White '890 in view of Jonas '792, and further in view of Lucent .............................................................................................153

Claim 35 of the '453 patent is obvious under 35 U.S.C. § 103(a) over White '890 in view of Farese '685, and further in view of Lucent .............................................................................................155

5.    Detailed Claim Analysis ('453 Patent Claim 36) .................................159

Claim 36 of the '453 patent is obvious under 35 U.S.C. § 103(a) over Focsaneanu '910 in view of Jonas '792, and further in view of Lucent .............................................................................................159

Claim 36 of the '453 patent is obvious under 35 U.S.C. § 103(a) over Focsaneanu '910 in view of Farese '685, and further in view of Lucent .............................................................................................161

Claim 36 of the '453 patent is obvious under 35 U.S.C. § 103(a) over White '890 in view of Jonas '792, and further in view of Lucent .............................................................................................163

Claim 36 of the '453 patent is obvious under 35 U.S.C. § 103(a) over White '890 in view of Farese '685, and further in view of Lucent .............................................................................................164

6.    Detailed Claim Analysis ('453 Patent Claim 38) .................................166

Claim 38 of the '453 patent is obvious under 35 U.S.C. § 103(a) over Focsaneanu '910 in view of Jonas '792, and further in view of Lucent .............................................................................................166

Claim 38 of the '453 patent is obvious under 35 U.S.C. § 103(a) over Focsaneanu '910 in view of Farese '685, and further in view of Lucent .............................................................................................167

Claim 38 of the '453 patent is obvious under 35 U.S.C. § 103(a) over White '890 in view of Jonas '792, and further in view of Lucent .............................................................................................169

Claim 38 of the '453 patent is obvious under 35 U.S.C. § 103(a) over White '890 in view of Farese '685, and further in view of Lucent .............................................................................................170

LIBA/1826077.1

VIII.   CERTIFICATION OF SERVICE ON PATENTEE.....................................171

IX.    STATEMENT IDENTIFYING THE REAL PARTY IN INTEREST.........................171

X.     REQUESTOR'S CORRESPONDENCE ADDRESS ...................................171

XI.    CONCLUSION.....................................................................................172

LIBA/1826077.1

**TABLE OF EXHIBITS**

1.  U.S. Patent No. 6,954,453 (Schindler)

2.  U.S. Patent No. 5,610,910 (Focsaneanu)

3.  U.S. Patent No. 6,069,890 (White)

4.  U.S. Patent No. 6,137,792 (Jonas)

5.  U.S. Patent No. 4,996,685 (Farese)

6.  Lucent Technologies Press Release, dated 9/17/96

7.  Answer and First Amended Counterclaims of Teles to Cisco Systems, Inc's Original Complaint and Request for Declaratory Judgment

8.  Teles' Supplemental Response To Cisco's Interrogatory Nos. 1, 2, 3, 6, and 7, dated June 19, 2007

9.  Cisco v. Teles, Nullity Action, German patent DE 196 45 368

10. Cisco v. Teles, Nullity Action, EP patent EP 0 929 884

11. Information Disclosure Statement

12. Office Action dated June 10, 2002 ('970 application)

13. U.S. Patent No. 5,732,078 (Arango)

14. Amendment dated December 12, 2002 ('970 application)

15. Office Action dated March 5, 2003 ('970 application)

16. Amendment dated July 3, 2003 ('970 application)

17. Office Action dated September 9, 2003 ('970 application)

18. Amendment dated March 19, 2004 ('970 application)

19. Supplemental Response" dated June 2, 2004 ('970 application)

20. Amendment dated June 3, 2004 ('970 application)

21. Second Supplemental Response dated July 2, 2004 ('970 application)

22. Examiner response dated August 23, 2004 ('970 application)

23. Group of claims (35-72) elected by Applicant on September 29, 2004 ('970 application)

24. Notice of Allowance dated February 25, 2005 ('970 application)

25. Applicant's Comments on Statement of Reasons for Allowance, dated May 27, 2005

26. U.S. Patent No. 6,125,113 (Farris)

*Ex parte* reexamination under 35 U.S.C. §§ 302-307 of United States Patent No. 6,954,453, "Method for Transmitting Data in a Telecommunications Network and Switch for Implementing Said Method," which issued on October 11, 2005, to Sigram Schindler et al. (the "'453 patent"), is respectfully requested. A copy of the '453 patent is included herewith as Exhibit 1. The '453 patent has not been deemed unenforceable. This request is brought on behalf of Cisco Systems, Inc., a Delaware Corporation ("Cisco" or "Requestor"). The references relied upon in this Request are as follows:

U.S. Patent No. 5,610,910 (Focsaneanu '910), Exhibit 2;

U.S. Patent No. 6,069,890 (White '890), Exhibit 3;

U.S. Patent No. 6,137,792 (Jonas '792), Exhibit 4;

U.S. Patent No. 4,996,685 (Farese '685), Exhibit 5; and

Lucent Technologies Press Release (Lucent or LPR), Exhibit 6.

## I.    CLAIMS FOR WHICH REEXAMINATION IS REQUESTED AND DISCLOSURE OF CONCURRENT LITIGATION

*Ex parte* reexamination of independent claim 34 and its dependent claims 35, 36 and 38 of the '453 patent is respectfully requested. These claims are referred to herein as the challenged claims or the claims under reexamination.

The present request for reexamination arises in connection with the assertion of these claims of the '453 patent against Requestor by the assignee of the '453 patent, Teles AG Informationstechnologien ("Teles"), in a district court action titled *Cisco Systems, Inc. v. Teles AG Informationstechnologien,* now pending in the United States District Court for the District of Columbia, Case No. 1:05-CV-02048 (RBW). A copy of *Answer and First Amended Counterclaims of Teles to Cisco Systems, Inc's Original Complaint and Request for Declaratory Judgment* is attached as Exhibit 7. The parties have exchanged initial discovery requests and

responses regarding claim construction and infringement. A copy of *Teles' Supplemental Response to Cisco's Interrogatory Nos. 1, 2, 3, 6, and 7* is attached as Exhibit 8. Cisco, the current Requestor, has also filed a Request for *Inter Partes* Reexamination of another patent issued to Schindler et al., U.S. Patent No. 7,145,902 (the "'902 patent"). That Request was submitted to the Patent Office on August 8, 2007, and is pending as Control No. 95/001,001. The '902 patent issued from the same specification as the '453 patent.

Preliminarily, Requestor also notes that the German Patent Court has recently declared invalid both a German patent and an EP patent that issued from the German applications from which the '453 patent claims priority. The invalidity decision came after nullity proceedings between the present parties. Copies of translations of the German court's 2006 nullity opinions are attached hereto as Exhibits 9 and 10, together with a list identifying the various references cited in the German decisions. The claims of the German and EP patents were similar to claims asserted in the '453 patent. Although the German court considered some of the references discussed below, it did not have the benefit of several of the additional references here, as these are prior art in the United States under 35 U.S.C. §§ 102(a), (b) and/or (e).

## II.    BRIEF OVERVIEW

Requestor requests reexamination of the '453 patent in view of the prior art cited in the Information Disclosure Statement provided herewith as Exhibit 11. A complete copy of each reference is also provided as Exhibits 2-6. These references render the challenged claims of the '453 patent unpatentable under both 35 U.S.C. § 102 and § 103. As detailed in the discussion and the claim charts submitted below, the limitations of the claims under reexamination are found in multiple references. Therefore, a substantial new question of patentability is raised by these references. Specific proposed rejections are identified in Sections VI and VII below.

LIBA/1826077.1

The nature of the claimed invention at issue here was described in the '453 patent as follows: "The invention relates to a method for transferring data from a first switch to a second switch, selectively by line switching or by packet switching, and to a switch for carrying out the method." '453 patent at Col. 1:7-10. More specifically, the Summary of the Invention states what the patentees understood the invention to be:

> "the present invention makes it possible during packet-switching connection between two switches to achieve a dynamic change-over to line-switching connection without interrupting the connection. ... Through the establishment of a line-switching connection between the switches, a bypass is produced according to the invention on which data can be transferred with fixed bandwidth and slight time delays substantially in real time so that the data blockage [in the packet-switched connection] is bypassed."

Col. 3:15-25. The change-over may be initiated by the originating caller, or by a "network management system." The patent describes such a changeover occurring during ongoing data communications, including telephone calls, over various circuit-switched or packet-switched networks, such as the Public Switched Telephone Network ("PSTN"),[1] the ISDN (which comprises both a circuit and packet switched network) or the Internet. Claim 34 of the '453 patent reads as follows:

> 34.    Switching apparatus for routing a telephone call comprising non-packetized data from a first end terminal located at a user's premises to a second end terminal located at another user's premises, selectively by line switching or packet switching, the switching apparatus comprising:
>
> means for establishing a connection through a line-switching network to the second end terminal;
>
> means for line-switching transferring data received from the first end terminal as non-packetized data over the line-switching network to the second end terminal;

---

[1]    Another term used to described traditional telephony is "Plain Old Telephone Service," or "POTS."

LIBA/1826077.1

> means for establishing a connection through a packet-switching network to the second end terminal;
>
> means for packet-switching transferring data received from the first end terminal as non-packetized data over the packet-switching network to the second end terminal; and
>
> means responsive to a control signal for transferring to a line-switching transfer or a packet-switching transfer to the second end terminal;
>
> said means responsive to a control signal changing-over to a line-switching data transfer or a packet-switching transfer during the existing transfer with the presence of said control signal.

Notably, the '453 patent does not purport to have invented the routing of telephone calls over either the line-switched PSTN or over packet-switched networks such as the Internet. Nor could it, as Internet telephony was well established before the October 1996 German application filing dates that the '453 patent relies upon for priority. For example, in U.S. Patent No. 6,069,890, issued to White et al. ("White '890," attached as Exhibit 3), a prior art patent that is relied upon here, the applicant describes a system for Internet telephony in which traditional analog telephones, ISDN terminal equipment, or even modified computers could be used to initiate telephone calls that could be routed over the Internet. White also described various prior art Internet telephony schemes, such as, for example:

> "One or more companies have recently developed software for use on personal computers to permit two-way transfer of real-time voice information via an Internet data link between two personal computers. In one of the directions, the sending computer converts voice signals from analog to digital format. The software facilitates data compression down to a rate compatible with modem communication via a POTS telephone line. The software also facilitates encapsulation of the digitized and compressed voice data into the TCP/IP protocol, with appropriate addressing to permit communication via the Internet. At the receiving end, the computer and software reverse the process to recover the analog voice information for presentation to the other party. Such programs permit telephone-like communication between Internet users registered with Internet Phone Servers." Col. 2:43-57.

4

The White '890 patent then goes on to cite a number of prior art patents disclosing the

transmission of voice/telephone calls through packet switched networks, including the Internet.

*See* Cols. 2:58-3:35. White '890 (and other art cited herein) makes it unequivocal that, prior to

the priority date of the '453 patent, various means of sending PSTN telephone calls over the

packet switched networks, including the Internet, were well known in the art.

Moreover, the ability to change a telecommunications connection, during an ongoing call

or data transfer, from a packet-switched connection to a line-switched connection was well

known in the art. As described in more detail below, the prior art repeatedly describes such a

change-over and various ways to accomplish this change-over. The art also discloses the reasons

why such a change-over would be made, and in doing so identifies the same issues/problems that

Schindler et al. later cite in the '453 patent as the impetus for their supposed invention. The prior

art even discloses the same methods and structure for resolving those problems by making a mid-

connection change from packet to line switching. The following are illustrative examples:

> *Focsaneanu, U.S. Patent No. 5,610,910 (Exhibit 2) at Abstract,*
> *Col. 4:31-33 & Figs. 8 and 13* (describing a new "access module"
> for telephony and data connections to the Internet and the PSTN:
> "The invention solves these problems by providing flexible and
> adaptable multiservice access to the networks. Customer
> requirements are checked by monitoring traffic on a local access at
> a connection request and/or during the established connection, and
> the local access is configured according to the transmission
> requirements." "It is another object of the invention to provide a
> system which can perform an alternate routing of services among
> transport networks.");

> *Lucent Press Release of 9/17/96 (Exhibit 6)* (describing a new IP
> telephony server: "the network management software will be able
> to transparently route traffic over either intra/Internet or the public
> network. If the Internet was too congested, for instance, the server
> could switch the transmission back to the public network.");

> *Jonas, U.S. Patent No. 6,137,792 (Exhibit 4) at Cols. 1:7-10,*
> *2:64-3:2 and Figure 1* ("This invention relates to a method and
> system for enabling data transmission over a bypass circuit-

switched network between two computers connected to a public packet-switched network, such as the Internet...." "[T]here exists a need for a method and system to enable computer users communicating across the Internet to transmit at least a portion of the communication across a network having a low initial connection cost, such as a circuit-switched public phone network...."); and

*Farese, U.S. Patent No. 4,996,685 (Exhibit 5) at Abstract and Cols. 11:66-12:5* (invention allowing a host computer "to dynamically change an ISDN access path ... between a packet switched connection and a circuit switched connection ... during the occurrence of the session ..." and "the host computer suitably instructs the Broker PC to change the communication channel during an on-going host session from circuit switched to packet switched as the communications needs of the host computer that occur during the host session change. This change occurs in a fashion that does not disrupt the host session and is substantially, if not totally, transparent to the user.").

In these references and in others discussed below, the prior art teaches the dynamic changing-over from packet-switching to line-switching, with the same purposes, structure and methods, not only between the packet-switched Internet and traditional circuit switched telephone networks, but also between other packet and circuit switched connections. As noted above, the prior art itself repeatedly suggests various motivations for adopting this change-over, and even suggests that the concept of the mid-connection change-over can be implemented in various different networks. *See, e.g.,* Farese '685 (Exhibit 5) at Col. 9:37-43 ("those skilled in the art will clearly realize that the teachings of the present invention can be readily applied to and incorporated within substantially any transmission network that can connect a host computer to a user through two or more separate communications connections that have different attributes...").

Finally, we note that the '453 patent itself acknowledges that the technologies used in the alleged '453 invention are not novel. The '453 patent thus represents, at best, a collection of known elements. *See, e.g.,* '453 patent at Col. 6:46 ("The technologies used are known per se.").

6

The '453 patent even admits that the structure of the claimed switch consists of known elements and uses known switching protocols. *See, e.g.*, '453 patent at Col. 8:23-52. What the patent does not recognize, and what was missed by the Patent Office during the prosecution of the '453 patent is that, indeed, identical structures for a switch that is capable of switching between packet and line-switched connections had already been disclosed in the prior art. *See, e.g.*, Focsaneanu '910 (Exhibit 2) at Figures 8 and 13 (discussed in more detail below).

## III.    DESCRIPTION OF THE '453 PATENT

As indicated above, the asserted claims of the '453 patent claim a switching apparatus for routing a telephone call comprising non-packetized data from a first end terminal to a second end terminal selectively by line-switching or by packet-switching, with the change-over between switching modes occurring during the existing transfer of the data of the telephone call.

According to the '453 patent, there are two basic different types of switching technologies: "The present-day situation in telecommunications is marked by a division between two different connecting and switching technologies. These are the synchronous line-switching technology (line-switching or circuit switching) and asynchronous packet-switching technology (packet-switching)." Col. 1:11-16. The alleged advantages of the invention claimed in the '453 patent relate to the efficient use of low cost packet switching over a packet switched network when that network is not congested, and when the packet switched network is congested using the relatively high cost line switching network that will allow the required transfer rate. "Line-switching connections are expensive, particularly during telephone conversations since the costs accumulate irrespectively of the information actually transferred. The advantage of a line switching connection is that it is free of any time delay and has a fixed bandwidth." Col. 1:44-48. "With Internet telephony, a cost-conscious caller uses the normal Internet with approximately 8 kbit/s bandwidth and a time delay of 0.5 seconds. When the Internet is

7

overloaded, the time delay of the individual packets becomes so great that an acceptable conversation connection between telephone partners is no longer possible." Col. 2:9-14.

The '453 patent states: "Based on the prior art, the present invention is concerned with the problem of providing a method for transferring data from a first switch to a second switch and providing a switching for carrying out the method which, depending on the data origin and headers of a user or network management system, allows flexible data transfer between the switches and more particularly cost-effective data transfer with real time properties. The solution according to the present invention makes it possible during packet-switching connection between two switches to achieve a dynamic change-over to line-switching connection without interrupting the connection." Col. 3:7-18.

The invention of the '453 patent is broadly described as a "switch" that has a packeting device for packeting and unpacketing data, an IP switching device for routing data packets, a line-switching device for establishing connections for switching through data channels and a control device which directs incoming data either to the IP switching device or to the line switching device depending on the control signals. Col. 3:41-47.[2]

The specification discloses only one embodiment of the claimed switch. In Figure 1 of the '453 patent, a telecommunications network according to the invention is shown with "switches" 7a and 7b according to the invention. A network containing several switches 7 and 7a is shown in Figure 3. The switches 7a and 7b integrate the functions of a packet switch and a

---

[2]    The '453 patent defines and describes the term "switch" broadly: "The term 'switch' is used below so that it includes both a line switch of a line switching network and a packet switch of a packet switching network." Col. 1:26:28. "A line switch, alias line switching equipment, is called telecommunications apparatus (TK apparatus) in the private sector, and exchanges of the network supplies in the public sector. A packet switch, alias packet switching apparatus, is also called a router, an IP switch or a host computer." Col. 1:29-33. "The term 'switch' is used in the sense of the present invention as already explained so that it includes both a line-switch of a line-switching network which copies over 1-byte packets, and a packet-switch (router) of a packet-switching network which copies over multi-byte packets. Data to be transferred can be any type of data, such as audio data, video data or computer files." Col. 3:30-36.

8

line switch. "The important factor is therefore the possibility of dynamically switching between packet-switching and line-switching during one transfer, [making it]… possible to change over, when desired, from an asynchronous packet-switching transfer of variable bandwidth to a synchronous line-switching transfer of greater and fixed bandwidth. Internet telephony and downloading of files from a WWW server are two important uses." Col. 7:18-26.

The only detailed diagram of the structure of the claimed switch is shown in Figure 4 of the patent, reproduced here:



The switch 7 is described as being part of both a packet-switching network (e.g., the Internet) and a line-switching network (e.g., POTS or ISDN telephone network). Data coming in through data input 74 can have any source, an IP switch/router, a line-switch such as an exchange point or a telecommunications unit, from a LAN or from an end terminal 1 or 2. Col. 8:16-34. The switch 7 has a line switching device 73 that has a digital coupling 731 which is known per se for switching through telephone conversation channels of the line-switching network, and a multiplex/demultiplex device 732 which produces sub-channels on existing data channels. The patent admits that the structures of the switch in Figure 4 are "technologies [that are] known per se." Col. 6:46; *see also* 8:35-53 ("[t]he switch 7 has a known IP switch 72;" the line switching device 73 "has a digital coupling 731 which is known per se.").

9

The internal control commands, as to whether packet switching or line switching is to take place are produced in a control device 71. The specification describes the control device 71 as a switch which forwards the incoming data either as data packets to the IP switch 72 or as bit flow to the line switching device 73. The change-over control unit 711 monitors and controls which open connections are present (i.e., which and how many data channels are connected) and which bandwidth the individual data channels require. The control device 71 has a change-over control unit 711, two packeting/unpacketing devices 713 and 714, and an intermediate register 712. The change-over control unit is connected to a topography data bank 75 which contains geographical data for a number of IP addresses. Cols. 8:56-9:2.

If the incoming data are IP packets, then the headers of the IP packets are evaluated by the change-over control unit 711. If the incoming data are a continuous data stream, then the signaling information of the signaling channel (in band signaling or outband signaling) are evaluated by the change-over control unit 711. The basic state thereby provides that the incoming data are sent into the Internet through the IP switch 72. If the incoming data do not yet exist as IP packets then they are packeted into corresponding IP packets in the packeting/unpacketing device 714 and sent to the IP switch. Col. 9:3-12.

The claimed change-over from packet-switching data transmission to line-switching data transmission occurs after the establishment of a connection to a second switch or the destination end terminal over the packet network. To change from the packet switching transmission of the data over the connection in the packet network to line switching at the command of the control unit 71, a connection in the line-switching network is made via the line-switching unit 73 (bypass) with another switch (destination switch). In an ISDN network, the ISDN signaling command SETUP is sent to the next exchange point. After the line switched connection over the

10

ISDN is established, the ongoing packet-switched transmission of data is terminated and all the incoming data of the communications connection considered are no longer directed through the IP-switch 72 but through the line-switching unit 73. The data are now transferred by line-switching with fixed bandwidth through the established bypass to the other switch. Col. 9:43-53.[3]

## IV.    PROSECUTION OF THE '453 PATENT

The '453 patent issued on October 11, 2005, from application number 09/147,970 (the "'970 application"). The patent claims foreign priority to German application No. DE 196 42 063 filed October 7, 1996 and German application No. DE 196 45 368 filed October 23, 1996.[4] A divisional application was filed on June 22, 2005, off of the '970 application, and this divisional application resulted in a second issued patent, U.S. Patent No. 7,145,902. A request for *inter partes* reexamination of the '902 patent has been filed separately.[5]

During the prosecution of the '970 application, in the first Office Action dated June 10, 2002 (Exhibit 12), the Examiner rejected the entire set of then-pending claims based on anticipation by Arango U.S. Patent No. 5,732,078 ("Arango '078," Exhibit 13). In response, by Amendment dated December 12, 2002 (Exhibit 14), the applicants cancelled certain claims and amended the remaining claims, to argue *inter alia* that "[t]he present invention is distinguishable

---

[3]    If the data exist as IP packets but are to be transferred line-switched through the line-switching device 73 then the data are, where applicable, unpacketed in the packeting/unpacketing device 713. More particularly the headers of the data packets are removed. Unpacketing is optional however and not absolutely necessary since data packets can be transferred line-switched where applicable according to the PPP protocol. The (packeted or non-packeted) data are transferred as bit stream to the line switching device 73 by the change-over control unit 711. '453 patent at Col. 9:13-22.

[4]    For purposes of the present petition, all of the cited references are prior art against the claimed German priority dates, but Requestor reserves the right to challenge this priority date if appropriate during this reexamination or in further court proceedings.

[5]    A continuation application, No. 11/456,549, has been filed from the 11/165,280 application (the application number from which the '902 patent issued), and is now pending in the Patent Office. A petition to make the application special has been granted.

in that the claimed method provides for a switch located at an end terminal and before the access point to a packet- or line-switching network," supposedly unlike the switches in Arango '078. Exhibit 14 at 9. The Examiner in an Office Action dated March 5, 2003 (Exhibit 15), maintained the anticipation rejection based on Arango '078, but noted that three dependent claims (not relevant here) would be allowable if rewritten in independent form.

The applicants then submitted another Amendment dated July 3, 2003 (Exhibit 16), and argued that various specific aspects of the revised claim language provided grounds to distinguish Arango '078, including the assertion that, in the amended claims, "[t]he first switch and the second switch are located at respective end terminals and are not part of the network infrastructure, but connect to the network infrastructure at access points which are part of the network infrastructure." Exhibit 16 at 13. In an Office Action dated September 9, 2003 (Exhibit 17), the Examiner again rejected the claims as anticipated by Arango '078 (except for certain dependent claims, which were in allowable form if rewritten), and added an anticipation rejection for the claims based on Jonas U.S. Patent No. 6,137,792 (Exhibit 4), a patent discussed in this request for reexamination. Applicants submitted another Amendment dated March 19, 2004 (Exhibit 18), to address the rejections, and included a lengthy discussion of how various features of the then-pending claims were allegedly not present in Arango '078 or Jonas '792, including the feature that the switch had to be located at the end terminal of the user and the switch had to be connected through a line-switching connection to an access point to the Internet. *See* Exhibit 18 at 16-17, 21, 24.

Applicants then submitted several documents: (i) a further "Supplemental Response" dated June 2, 2004, making the same and additional arguments (Exhibit 19); (ii) a Supplemental Amendment dated June 3, 2004 (Exhibit 20), which added a series of new claims (35-72) and

argued, inter alia, that "[n]either Jonas nor Arango disclose the routing of a telephone call or of non-packetized data" (Exhibit 20 at 25); and (iii) a Second Supplemental Response dated July 2, 2004 (Exhibit 21), that contained repeated argument of the previously stated grounds for why the then-pending claims were not anticipated by Arango '078 or Jonas '792.

The Supplemental Amendment of June 3, 2004 (Exhibit 20) contained, for the first time, new claims Nos. 68, 69, 70 and 72, which correspond to the claims (now numbered 34, 35, 36 and 38) at issue in this Request. The Supplemental Amendment states as follows about these claims:

> New independent Claim 68 calls for (underlining added for emphasis): … Switching apparatus for routing a <u>telephone call</u> comprising <u>non-packetized data</u> from a first end terminal located at a user's premises to a second end terminal located at another user's premises, selectively by line switching or packet switching, the switching apparatus comprising: … means for establishing a connection through a line-switching network to the second end terminal; … means for line-switching transferring data received from the first end terminal as non-packetized data over the line switching network to the second end terminal; … means for establishing a connection through a packet-switching network to the second end terminal; … means for packet-switching transferring data received from the first end terminal as <u>non-packetized data</u> over the packet-switching network to the second end terminal; and … means responsive to a control signal for transferring to a line-switching or a packet-switching transfer to the second end terminal; … said means responsive to a control signal changing-over to a line-switching data transfer or a packet-switching transfer during the existing transfer with the presence of said control signal.

> ***Claim 68 sets forth a switching apparatus for routing a*** <u>***telephone call comprising non-packetized data***</u> ***from the first end terminal to a second end terminal. Neither Jonas nor Arango disclose the routing of a*** <u>***telephone call***</u> ***or of*** <u>***non-packetized data***</u>***. They are limited to the transferring of data packets between computers. Accordingly, neither Jonas nor Arango disclose: means for line-switching transferring data received from the first end terminal as*** <u>***non-packetized data***</u> ***over the line-switching network to the second end terminal; and means for packet-switching transferring data received from the first end terminal***

13

> *as __non-packetized data__ over the packet-switching network to the second end terminal.*
>
> Accordingly, the Applicants submit that Claim 68 is novel and non-obvious in view of the cited Arango and Jonas references.
>
> Claims 69-72 are dependent on Claim 68. As such, these claims are believed allowable based upon Claim 68.
>
> Exhibit 20 at 25-26 (bold and italic emphasis added).

Moreover, in the Second Supplemental Response (Exhibit 21) at 6-8, Applicants identified certain corresponding structure for the "means plus function" elements contained in application claim 68. The applicants took the position that the structure for the "means" elements is contained entirely within Figure 4 of the patent, specifically, the line switching device 73, the IP-switch 72, and the control device 71. Exhibit 21 at 7. As noted above, the '453 patent itself admits that the structures of the switch in Figure 4 are "technologies [that are] known per se." Col. 6:46; *see also* Col. 8:35-53 ("[t]he switch 7 has a known IP switch 72;" the line switching device 73 "has a digital coupling 731 which is known per se").

With respect to the requirement of "non-packetized data" from the first end terminal, Applicants cited as their basis for this limitation that "[t]he end terminal had been identified [in the specification] before as possibly being an analog telephone or ISDN-telephone. ... Further, [Col. 8:23-24] states that a switch may have an analog interface with an A/D converter. Data received from an analog interface are non-packetized data." Exhibit 21 at 6-7. With respect to the last element of the claim (referred to as element 34(f) below), Applicants stated as follows:

> The feature that the means responsive to a control signal change-over to a line-switching data transfer or a packet-switching transfer during the existing transfer with the presence of a control signal is disclosed on page 17, lines 11 to 20 [now Col. 9:36-53]. A change-over from packet-switching to line-switching is disclosed on page 7, lines 13 to 15 [now Col. 4:25-27].
>
> *Id.* at 8.

LJBA/1826077.1

The text cited by Applicants to support the "during the existing transfer" claim language highlights the fact that the change-over from packet to line switching occurs, in response to a control signal, during the existing transfer of data over a telephone call connection that has already been established between the first and second end terminals. For example, at Col. 9:43-53, the patent describes how the bypass connection over the line-switched network is created during the ongoing "communications connection considered" and the changing-over the data transfer so that "all the incoming data of the communications connection considered are no longer directed through the IP-switch 72 but through the line-switching unit 73. The data are now transferred by line-switching with fixed bandwidth through the established bypass to the other switch." The reason for doing this was highlighted in the Background of the Invention as being to protect the quality of the packetized voice data transfer: "When the Internet is overloaded, the time delay of the individual packet becomes so great that an acceptable conversation connection between telephone partners is no longer possible." Col. 2:11-14.

The Examiner responded by imposing a restriction requirement under 35 U.S.C. § 121, on August 23, 2004 (Exhibit 22), to require applicants to elect between two classes of claims, with the newly added second set of claims (35-72) all having the separate utility associated with the claimed feature described by the Examiner as "transferring of non-packetized data from a first end terminal to a second end terminal." Exhibit 22 at 2. On September 29, 2004, applicants elected this second group of claims (35-72). *See* Exhibit 23. On February 25, 2005, the Examiner issued a Notice of Allowance (Exhibit 24), stating that the elected claims all had the "uniquely distinct features as described at 23-26 of the Remarks filed on 6/3/04, and at 8-9 of the Remarks filed on 7/2/04." Neither Arango '078 nor Jonas '792, the Examiner stated, anticipated or rendered obvious these particular claims. There is no indication that any other obviousness

15

combinations had been considered.  On May 27, 2005, Applicants submitted a "Comments on Statement of Reasons for Allowance," stating *inter alia* that "Applicant believes the Examiner's stated reasons for allowance are unnecessary.  The applicant does not necessarily agree with each statement in the reasons for allowance."  Applicants' Comments on Statement of Reasons for Allowance, dated May 27, 2005 (Exhibit 25).  The Applicant did not point out any basis for disagreeing with the Examiner's statements.  *Id.*  The '453 patent issued on October 11, 2005.

## V.    OVERVIEW OF THE PRIOR ART

The following overview discusses the five prior art references that are being relied upon here to anticipate certain of the claims of the '453 patent and/or render the claims  unpatentable under 35 U.S.C. § 102.  These references and their detailed application to the '453 patent claims are described in the sections that follow, and the claim charts submitted herein also provide details of the references and the proposed rejections and SNQs on a claim-by-claim basis.

### A.    U.S. Patent No. 5,610,910 (Focsaneanu '910), Exhibit 2

U.S. Patent No. 5,610,910 (Focsaneanu '910) is entitled "Access to Telecommunications Networks in Multi-service Environment."  It was filed in the U.S. Patent Office on August 17, 1995, and issued on March 11, 1997.  Focsaneanu '910 is prior art under 35 U.S.C. § 102(e).

Focsaneanu '910 broadly covers an "Access Module" that enables a wide variety of end terminal equipment, including telephones, to make connections through the PSTN or a data network such as the Internet and to dynamically change those connections between the different switching modes.  Figure 7 of Focsaneanu '910 provides an overview of the various different kinds of equipment and network services that are able to use the Access Module described in the '910 patent, with the Access Module 208 corresponding exactly with the structure, alleged uses and location in the network of the "switch" of the '453 patent:

16



The Focsaneanu '910 patent, in describing the motivation for its invention, previews the same issues/problems later identified in the '453 patent. Focsaneanu '910 describes the channelized inefficient nature of existing voice telephony networks where multiple services have varying demands for bandwidth and holding times, or a service generates traffic that is bursty in nature. The invention of Focsaneanu '910 solves these problems by providing flexible and adaptable multiservice access to PSTN (line switched) and data (packet switched) networks, including the Internet. Customer requirements are checked by monitoring traffic at a connection request and/or during the established connection, and the local access is configured according to the transmission requirements. The local access can also be configured in response to the network information. *See, e.g.*, Abstract. The system and method describe the ability to switch between a packet switching data network and a line switching PSTN network in real-time, based on customer needs or conditions set and evaluated by monitoring the network.

17

The inventions described in Focsaneanu '910 relate particularly to a multi-service platform which allows consumer devices such as a POTS telephone set (customer premise equipment or CPEs), to access a plurality of telecommunication networks, including the Internet and public switched telephone network (PSTN). Col. 1:7-45. Focsaneanu '910 identifies the fixed channelized bandwidth of PSTN networks and the cost savings of packet switched networks, but recognizes the two types of networks exist separately and independently. Cols. 1:45-45; 2:20-24; 2:40-48. An object of the invention in Focsaneanu '910 is to provide better utilization of customer equipment such as telephones by providing an intelligent connection (or switch) to multiple types of transport networks in multiple protocol environments, such as a PSTN network and the internet's packet switched network. Another object is to provide optimization and alternate routing of services among transport networks. Col. 4:10-35.

The inventors of the '910 patent recognized the number of subscribers to the "Internet" was growing at a very fast pace and expected that growth in the usage of data networks to continue. They also recognized that access to such packet switched data networks through the existing telephone network and subscriber's loop was very inefficient and cumbersome.[6] The invention described in Focsaneanu '910 is directed to solving these problems to create a global data network with capabilities of switching between network types such as PSTN and the Internet freely and efficiently. Cols. 6:45-52; 6:64-7:9. The '910 patent's method of switching between line switching (PSTN) networks and packet switching (data) networks is described in the same manner and implemented for the same reasons as later stated in the '453 patent: efficiency and cost savings.

---

[6]   Figure 4 of Focsaneanu '910 shows a conventional PSTN line or circuit switched network. Figures 5 and 6 of Focsaneanu '910 show how telephone sets and computers are connected through a PSTN in the known ISDN environment to provide both line switched and packet switched connections. Col. 6:3-44.

18

As noted above, Figure 7 of Focsaneanu '910 and the corresponding text in the specification describes an "access module 208" or switch in which a plurality of consumer equipment including POTS telephones generating non-packetized data can access a plurality of different types of services provided by service providers which may utilize different types of transport networks, such as a line switched network PSTN 212 and data (packet) switched networks 214. "The data switched networks may include, among other networks, a packet switched network, an ATM network using protocols such as TCP/IP, X.25, ATM, etc. Two types of local switches, one with a D channel handler for ISDN access and one without it, are shown in the PSTNs." Col. 7:10-20.

Figures 8 and 13 of Focsaneanu '910 and the corresponding text in the specification describe a switch called "access module 234" in more detail. The switch or access module 234 in Figure 8 is at the end of the local access line and has a line interface 236 for local access by consumer telephone and computer equipment.



The switch (access module) of Figure 8 in Focsaneanu '910 includes a processor 246 that performs a selection and enablement of either POTS (plain old telephone service) line switching service or data services such as packet switching. The access module or switch also has a local database 248 which stores information concerning user profile, address table and service provider profile, etc. A controller 252 analyzes the contents of a data connection request to identify the service requested. Upon identification of the type of service requested, the controller performs address conversion, protocol conversion, rerouting, etc., and exchanges packetized data formed at PAD 254 (packet assembly/disassembly) with the data network in accordance with information stored in the database. Information arriving at the switch in non-packetized form can be packetized, if necessary in the PAD 254 (or at PAD 550 in Figure 13). The information from the database may also require the switch to perform multiplexing functions from other line interfaces 256 by MUX 258. Col. 8:1-27.

A customer's service request is detected in the switch (access module) and a determination is made whether the request is for data (packet) services or PSTN services. The type of data service is determined by consulting a database. The service request comes to the switch (access module) from either direction, in one instance a near end user requests a service from service providers and in another, in response to a service request from a far end user, a service provider requests an access module to make a connection to any phone equipment at the near end user. Detection of a service request is performed by a "service default" procedure. When the access module is in the service default state, the network is normally receiving and expecting packet data. Therefore data can be initiated from or received by the consumer phone equipment at any time. In the PSTN mode the default is POTS or line switching services. The

20

switch (access module) can alter the state of the access at any instant after a service request is received. Col. 9:30-51.

A change of mode can be caused by an initiated request by the user, or by an automated observation of the channel, where the switch (access module) monitors customer communications activity during an already-established call. Col. 10:20-24. By using information stored in the database, protocol translation, and address conversion, it is possible to mediate services on a service by service basis through the use of mediation in the switch (access module) based on tables under the control of both the users and services providers. The switch or access module can then interface with a variety of data networks to deliver/receive the data services traffic. The actual network selection is based on the information contained in the user service profile. An embodiment of this functionality includes one or more circuits providing gateway functions to the associated network equipment. Cols. 10:61-11:4.

Figure 13 of Focsaneanu '910 shows another embodiment of the access switch in which "the access module can dynamically select a different network from the one prescribed in the user profile, to carry the packetized data traffic. This alternate selection will not adversely impact the quality of service (QOS). An example of the use of this capability is to route data traffic on PSTN during low traffic load periods. Similarly, the access module can packetize voice at PAD 550 (packetize/depacketize) and route voice traffic on a data network. The voice service QOS is maintained by continuous monitoring of the transmission delay." Col. 11:7-21 & Figure 13.



**Fig 13**

Several non-content altering functions include data compression at 552 and statistical multiplexing at 554 of Figure 13. The transceiver in the switch or access module monitors the traffic coming in from both directions using a database storing the user profile, the available communications resources and the status of these resources. The processor in the access module determines an intelligent method of handling the customer traffic by consulting the database information. Col. 11:60-67.

The switch allows the user to designate an intention to place a POTS call or establish a data connection by various means, including abbreviated dialing and other means of passing status information and control messages to the access module. Col. 13:5-15. The methods can also be used "to initiate a change from an established data call to a voice call, or from an established voice call to a data call." Col. 13:32-34.

The switch or access module also has the capability of providing conversion between packetized voice and PCM to allow for alternate routing. Col. 13:41 *et seq.* "This allows the use

22

of a multiplicity of access and transport networks in the establishment, translation, and completion of a service transaction by the access module under the control of the end user. Providing protocol translation, address conversion, and mediation of services on a service by service basis is also possible." Col. 13:41-49. The switch or access module provides address translation and address correlation functions by specific routing tables that are contained in the switch module. These routing tables are updateable from various sources in the overall network for use in, for example "the correlation of an Internet user address with his PSTN address for delivery of voice traffic originated on a computer to a telephone set." Col. 13:41-49; 62-67.

The invention disclosed in Focsaneanu '910 "provides for logical assignments in real time at the access module or services provider for alternate routing among available transport networks, e.g. voice can be routed over data (packet) networks and data can be routed over PSTN networks. This allows dynamic traffic load balancing, alternate routing, resource sharing and service management of the information transfer throughout the network, thereby minimizing protocol and transport translations between the end points." Col. 14:13-20.

The switch (access modules) described in Focsaneanu '910 has all the detailed features of the switch described and claimed in the '453 patent as shown below. This can be readily shown by comparing the switch structure disclosed in Figures 8 and 13 of Focsaneanu '910 with the switch structure disclosed in Figure 4 of the '453 patent. The structures are identical in all material respects:

LIBA/1826077.1

**Focsaneanu '910**                    **'453 Patent**





| Focsaneanu '910 Figs. 8 & 13 | | | '453 Patent Fig. 4 | |
|---|---|---|---|---|
| Access Module | 234 | Same or Equivalent | Switch | 7 |
| Processor | 246 | Same or Equivalent | Control Device | 71 |
| PAD (packet Assembly-Disassembly) | 254 (550 in Fig. 13) | Same or Equivalent | Packet/Unpacket | 713/714 |
| Controller | 252 | Same or Equivalent | Change Over Control | 711 |
| Local Database | 248 | Same or Equivalent | Data Bank | 75 |
| MUX (Multiplexer) | 258 | Same or Equivalent | Multiplex/Demultiplex | 732 |
| Transreceiver | 238 | Same or Equivalent | Intermediate Register | 712 |
| PCM (Fig. 13) | 552 | Same or Equivalent | Coupling Field | 731 |
| Data Compression (Fig. 13) | 554 | Same or Equivalent | Data Compression | 721 |

24

Thus, Focsaneanu '910 discloses not only the same problems and issues to be addressed by the access switch, it identifies the very same solutions and the same structure, all in anticipation of the claims of the '453 patent.

**B.    U.S. Patent No. 6,069,890 (White '890), Exhibit 3**

U.S. Patent No. 6,069,890 (White '890) is titled "Internet Telephone Service," and was filed on June 26, 1996, and issued on May 30, 2000. White '890 is prior art under 35 U.S.C. § 102(e).

As noted above in the Overview, White '890 discloses a system and switching apparatus whereby an analog POTS telephone generating non-packetized data may be used to carry out standard telephone calls over the PSTN, or may also be used to make telephone calls that are routed over the Internet. "Public switched telephone networks utilizing program controlled switching systems are arranged in an architecture with the Internet to provide a methodology for facilitating telephone use of the Internet by customers on an impromptu basis. Provision is made to permit a caller to set-up and carry out a telephone call over the Internet from telephone to telephone ...." Abstract.

Figure 2 of White '890 shows how an analog telephone 56,[7] can be connected to a central office switch 50 for the line-switched PSTN network 57, and also to an Internet Module 72, that provides access to the Internet 84.

---

[7]    The White '890 patent states that the customer premises have "customer premises equipment (CPE) such as telephone terminals 56 and 58. These may be basic instruments for providing Plain Old Telephone Service (POTS)," i.e., analog telephones. *See, e.g.*, Col. 7:28-39 ("The originating Internet Module and central office switching system also act in inverse fashion to deliver to the originating telephone station an analog voice signal.").

LIBA/1826077.1



FIG. 2

As shown in Figure 2, the telephones at the calling and called ends of a communication can communicate directly through the line-switched PSTN. Alternatively, they may communicate over the Internet through a connection between a central office 50 and the Internet Module 72. The Internet Module may have the structure shown in Figure 3, including an interface with processing capability 87, a router (IP switch) 85, with the router controlled by conventional Internet servers 89 and 91. *See* Col. 5:24-50. The central office switching equipment 50 may be connected with the Internet Module by T1 trunks, or "[a]lternatively the Internet Module hardware may be situated at the central office and associated with the switching system." Col. 5:26-28. Thus, like Focsaneanu '910, White '890 teaches the use of a single switch that incorporates both a line-switched PSTN connection and a packet-switching Internet Module or router, to enable an analog POTS telephone to originate calls that could be selectively routed over either the PSTN or the Internet.

The routing of the call over the Internet may be caused by the user dialing a special access code (e.g., *82, *see* Col. 5:64), or may be done independently by the telephone company

26

providing a control signal (*see, e.g.,* Col. 3:58-61 ("It is yet another object of the invention to provide voice service over the public telephone systems via the Internet where the use of the Internet is optional to the Telco and transparent to the customer.")). At Cols. 5:52-6:45, White '890 describes how an call originating at the POTS telephone is caused to be routed through the Internet Module 72 and to the called party at the POTS station 58. *See, e.g.,* Col. 5:55-57 ("The subscriber in this example uses the POTS station at 56 to initiate an Internet call to a called party at the POTS station 58."). The patent describes how the non-packetized data arriving at the Internet Module from the originating telephone and the line switch is packetized: "the originating Internet Module 72 is receiving from the originating central office 50 over the trunk connection digitized speech in DS0 format. The Internet Module implements the function of a packet assembler and disassembler or PAD and assembles packets in TCP/IP format. ... The packets are dispatched from the originating router 85 onto the Internet and are delivered to the destination router and Internet Module 74. ... The destination router and its processor interface perform the inverse function of the originating router...." Col. 7:12-24.

As also noted in the Overview above, the White '890 patent demonstrates just how well known it was that Internet telephone calls could be placed using a variety of different end terminal equipment, including equipment generating non-packetized analog signals. For example, White specifically points out that it was known in the art that computers (such as those disclosed in the Jonas '792 and Farese '685 references) could be used as end terminals to enable not only data transmissions, but also telephone calls that could be routed over the Internet. White '890 states at Col. 2:43-57:

> "One or more companies have recently developed software for use
> on personal computers to permit two-way transfer of real-time
> voice information via an Internet data link between two personal
> computers. In one of the directions, the sending computer converts

> voice signals from analog to digital format. The software facilitates data compression down to a rate compatible with modem communication via a POTS telephone line. The software also facilitates encapsulation of the digitized and compressed voice data into the TCP/IP protocol, with appropriate addressing to permit communication via the Internet. At the receiving end, the computer and software reverse the process to recover the analog voice information for presentation to the other party. Such programs permit telephone-like communication between Internet users registered with Internet Phone Servers."

The White '890 patent then goes on to cite a number of prior art references disclosing the transmission of voice/telephone calls through packet switched networks, including the Internet. *See* Cols. 2:58-3:35. White '890 makes clear that, prior to the priority date of the '453 patent, the sending of telephone calls over the packet switched networks, including from computer terminals that were modified to carry voice transmissions, was well known in the art.

**C.    U.S. Patent No. 6,137,792 (Jonas '792), Exhibit 4**

U.S. Patent No. 6,137,792 (Jonas '792) is titled "Method and Apparatus for Enabling Transmission of Data Packets Over a Bypass Circuit-switched Public Telephone Connection." The application leading to Jonas '792 was filed on June 14, 1996, and the patent issued on October 24, 2000. Jonas '792 is prior art under 35 U.S.C. § 102(e). Jonas '792 is another prior art example of employing a change-over from packet-switched transmission of data from an originating end terminal through a router and then over the Internet, to line-switched transmission of data from the same call over a line connection, such as the ISDN or PSTN, to the same destination end terminal.

Jonas '792 discloses that computers can be networked together via a public packet-switched network known as the "Internet" and that public packet-switched networks are themselves comprised of networks of other packet-switched networks. Cols. 1:23-26; 46-47. Jonas '792 recognized the problem when communicating across public packet-switched

28

networks, such as the Internet, of the presence of "delays" or pauses which occur when a packet must wait for transmission-related resources to become available at individual routers or nodes along its path. A user transmitting or receiving critical data across a network may not be willing to tolerate these delays. Accordingly, Jonas '792 disclosed "a need for a method and system to enable computer users connected to a public packet-switched network to transmit at least a portion of a communication between hosts on a circuit or line switched network with minimal delay time, and acknowledged that such a method may require additional costs and resources, as compared to transmitting solely over the Internet. Col. 3:4-23.



FIG. 1

Figure 1 of Jonas '792, above, helps to illustrate the invention. The originating host computer 1 and the destination host computer 2 are each connected to the public packet-switched network via router computers, or switches. Each router is also able to connect with one or more other routers via the line-switched telephone network. The originating host 1 can begin a data transmission by, for example, placing a call to the router 20 "via a switched dial-up connection provided by the local telephone service." Col. 4:3-8. The router 20 then establishes a connection for packet switching of the data for the call data over the Internet to the receiving router 21 and the second host 2.[8] Packet switching communication of data begins. During the

---

[8]    The disclosed system can clearly accommodate multiple origin and destination end terminals, as the "[r]outers 20 and 21 are typically provided by an Internet Commercial Service Provider, however, alternate

29

transmission, packets to be sent over the alternative network may be so designated in the IP header or through other means.[9]  Col. 4:42-53.  The sending router 20 determines from the header that the data is to be transmitted over the bypass network, and establishes a connection over the line-switched telephone network to router 21, and then changes over to transmit the data through the bypass line-switched telephone network.  Col. 3:35-47.  The bypass line-switched network connects the source and destination routers 20 and 21 respectively. The routers may transmit the packet over a regular dial-up analog phone line or the packets may be transmitted over public ISDN telephone facilities.  Col. 4:21-26.[10]

"The host may wish to transmit via the bypass network if the delay time over available paths on the Internet is unacceptable, such as for interactive or other time-critical applications." Col. 4:17-20.  The reference to "interactive" or other "time critical applications," would suggest to a person of skill in the art that the bypass might also be used for voice communications.

The source router 20 in Figure 1 has sufficient logic to determine whether there is an existing alternate network connection to the destination router 21 by examining a memory file of existing alternate network routers.  Where multiple "classes of service" are allowed, the source router 20 must further determine whether the existing link meets the desired class of service.  If there is no suitable existing connection, the source router 20 will determine the address of the

---

configurations are also available, such as one or more of the hosts being directly connected to the Internet as a router or gateway computer." Col. 4:8-13.

[9]    The specification discloses that it will be apparent to those of skill in the art that the packet-switched network may support any of a number of protocols, such as TCP/IP, DECnet, or the ISO/OSI protocol. Moreover, both the source and destination routers 20 and 21 may be physically the same computer as the source host 1 and destination host 2, respectively, thereby placing all the logic for determining when and how to switch from the line switched network to the packet switched network in the routers. Col. 6:11-26.

[10]    Jonas '792 explained that those skilled in the art would understand that many variations of public telephone networks are possible, the intent of the invention being to utilize a line-switched connection over at least a portion of the data path between the source router 20 and the destination router 21.  For example, a portion of an ISDN route may include a packet-switched segment. As used herein, the term "packet-switched" shall include both packet and message switched connections. Col. 4:21-36.

LIBA/1826077.1

destination router 21 on the circuit-switched network. Again, where multiple classes of service are allowed, the source router 20 must also determine whether the destination router 21 is capable of receiving the appropriate connection. The source router 20 then establishes a connection (i.e. "dials" the call) over the line-switched network 30 to the destination router 21 and updates the memory file of existing alternate network connections. The specification of the Jonas '792 patent states "It will be obvious to those skilled in the art that multiple alternate designation networks or connections may be used each having different characteristics, such as delay time (circuit-switched or packet-switched subpaths) and bandwidth." Col. 5:3-7.[11]

The specification also expressly contemplates applications which may "dynamically take advantage of both the inherent cost benefit of using the packet-switched Internet and the minimal delay time of circuit-switched telephone networks ... by having the system monitor the transmission delay between the source router 20 and destination router 21... [and if] this delay rises above a threshold value the source router 20 will establish a connection over the bypass network 30." In such an instance, the control signal for changing over to line switching is generated by the management software of the router, not by the end user(s). The source router may detect the transmission delay using a variety of measures known to those skilled in the art, including topological delay time for the transmission, cost, or the number of gateways through which the network path traverses ("hops"). While transmitting over the bypass network 30, the source router 20 may continue to monitor the delay time between the source router 20 and

---

[11]    The Jonas '792 patent further discloses that once a connection between source and destination routers 20 and 21 has been established, the source router 20 will monitor the traffic between the source and destination routers and will disconnect the line-switched connection if there is no activity in either direction after a preset time, preferably 60 seconds, although this time-out period may also be either end-user or router-administrator configurable.

31

destination router 21 by sending occasional "ping" messages to the destination router 21 and monitoring delay times of any response packets. Cols. 5:53-6:3.

The Jonas '792 patent also describes that different data from a single communication can be transmitted by means of the bypass over packet and line switched networks during the ongoing communications connection (i.e., a single call). *See, e.g.*, Col. 2:54-67 (referring to the present invention as a potential alternative to encryption, and stating "there exists a need for a method and system to enable computer users communicating across the Internet to transmit *at least a portion of the communication* across a network having a low initial connection costs, such as a circuit-switched public phone network...."); Col. 3:15-20 ("there exists a need for a method and system to enable computer users connected to a public packet-switched network to transmit *at least a portion of a communication* between hosts on a circuit-switched network with minimal delay time."). Thus, first data from a call may be sent over the packet network, and second data over the switched network, and the data from this single communication are combined again in the second router. Col. 5:8-12 ("The destination router 21 will receive notification of an incoming call over the circuit-switched network and execute a process to accept the connection and integrate data packets from this connection into the packets received from the packet-switched connection. ... If the data protocol is 'connection oriented,' such as the TCP protocol, the data packets must be reordered into a sequential order by the receiver."). Thus, Jonas '792 explicitly applies to the sending of "first data" of a single connection on one network and "second data" on the other, without interrupting a call set up procedure or an existing connection.

D.    **U.S. Patent No. 4,996,685 (Farese '685), Exhibit 5**

U.S. Patent No. 4,996,685 (Farese '685), entitled "Technique for Dynamically Changing an ISDN Connection During a Host Session," was filed on April 10, 1989, and issued February 26, 1991. Farese '685 is prior art under 35 U.S.C. §§ 102(a) and (b). Farese '685 describes a

platform and a technique that "dynamically change[s] the ISDN access path between packet switched connection and a circuit switched connection during an ongoing host session with the user in order to provide a particular ISDN connection that is most suited to the communication requirements of a current task being executed by the host computer during the session." Col. 1:12-18 (emphasis added).

The Farese '685 inventors recognized that "a need exists … for dynamically changing an ISDN path … between a circuit switched connection and a packet switched connection during a host session according to the communications demands of the host computer that occur during the session." Col. 6:35-42; id. at Col. 6:4-35 (discussing the reasons for the need, including that "circuit switched connections are far more expensive than packet switched connections," and thus it is preferable not to leave the circuit switched connections open during times when packet switching is itself adequate for the transmission).

The inventors of Farese '685 provided a solution through a "technique for use in conjunction with an ISDN switch for dynamically changing an ISDN access path that connects a user to the switch and therethrough to a host computer, between a circuit switched connection and a packet switched connection during a host session according to the communication demands of the host computer that occur during the session." Col. 6:36-42. The solution was that the "ISDN connection provided over the access path, rather than being static as is taught in the art, dynamically changes in response to commands (suitable control messages) that are issued by the host computer." Col. 7:4-8. The invention allows "dynamically changing the ISDN path. . . from a first connection such as a B channel circuit switched connection, to a second connection, such as a D channel packet switched connection or vice versa during an ongoing host

session...." Cols. 6:58-7:4.[12]  The dynamic change occurs "in response to a command received from the host computer during execution of the host session."  Col. 7:14-33.  "The host commands, such as 'Transition to D Channel' and 'Transition to D Channel' are determined by the communication requirements of the current task."  Col. 7:43-46.



FIG. 1

Figure 1 of Farese '685, above, shows a configuration of the invention.  The host computer 70, by determining whether and when to issue the change-over control instructions, and working together if necessary with a second "Broker PC," functions as a network manager for the system.  *See, e.g.,* Cols. 20:62-23:36 & especially 21:68-22:4 ("These transition request messages are interpreted by the Broker PC as discussed above to dynamically manage the ISDN

---

12    ISDN provides "B" channels and "D" channels. Col. 1:29-31.  "The 'D' channel can only carry packets; while each of the 'B' channels can carry either packets or continuous (circuit switched) signals." Col. 1:33-36.  When a call is initiated, either a packet switched connection or circuit switched connection may be selected. Col. 1:36-46.  "With this arrangement, an ISDN switch can provide either a circuit switched connection or a packet switched connection to a caller." Col. 1:47-49.

LIBA/1826077.1

connection"). Management of the ongoing packet-switching connections by the host computer could involve monitoring the ongoing packet switching traffic and determining whether certain thresholds are exceeded. *See, e.g.*, Col. 23:26-36 ("the host computer could analyze the actual communication occurring between itself and a user and decide, based upon various pre-defined rules that specify specific thresholds for e.g., during and/or amount of communication flowing in each direction between the user and the host computer, which type of access path should be established for any given situation and then, based upon whether these thresholds were exceeded or not, dynamically change the type of ISDN access path accordingly"); *see also* Col. 34:18-25 ("the host computer could employ a suitable algorithm, which statistically determines on a global basis ... whether a B or D channel ISDN connection should be used in a given situation").

When Schindler et al., referred to Farese '685 in the text of the '453 patent specification, they acknowledged that it showed the same type of "dynamic" change-over from packet switching to line switching they now are trying to claim in the '453 claims. *See* '453 patent at Col. 2:23-31. Nonetheless, they incorrectly denigrated and significantly misrepresented the Farese '685 teachings as being applicable only to ISDN, and not to the transfer of data in a network:

> "The method disclosed in U.S. Pat. No. 4,996,685 is restricted to undertaking on an ISDN connection a change between a line-switching and a packet-switching data transfer whereby a line-switching transfer is carried out on a B channel and a packet-switching transfer is carried out on the D channel. A method of this kind is indeed expedient to produce effective access from an end subscriber to a host computer, possibly an exchange point of the telephone network or an access point to the internet, but does not relate to the transfer of data between switches or routers of a network."

> '453 patent at Col. 2:32-42.

LIBA/1826077.1

A review of the Farese '685 specification, however, confirms that Farese's invention was not limited to a single user and host, over a single ISDN line, but was broadly applicable to transmitting data in a network with many end users, each of whom are communicating with one or more hosts by packet or line switching through a network containing multiple ISDN switches that can each carry packet-switched or line-switched connections. *See, e.g.*, Col. 11:21-25 ("Although a single ISDN switch is shown at one central office, this switch would in actuality likely be replaced by an ISDN network that contains multiple ISDN switches inter-connected by appropriate end-to-end transport and toll switching facilities."); Col. 11:36-37 ("Host system 70 illustratively contains independent host computers 70-1 and 70-2..."); Col. 13:3-5 ("System 5 can accommodate a multitude of users to dynamically change the ISDN channel (between circuit and packet switched) used by each user...").

Even more important, the inventors of Farese '685 explicitly recognized that, while the embodiment shown in Farese '685 is directed toward packet switched communication on an ISDN "D Channel" and circuit switched communication on an ISDN "B Channel," the invention was applicable broadly and could be used with any two different communication networks, stating:

> "*After reading the following detailed description, those skilled in the art will clearly realize that the teachings of the present invention can be readily applied to and incorporated within substantially any transmission network that can connect a host computer to a user through two or more separate communication connections that have different attributes, such as illustratively throughput, transport delay or cost of use.* For example, one such connection may be optimized to carry high density low-delay traffic; while the other connection may be optimized to carry low density traffic that is relatively delay insensitive."

> Cols. 9:36-10:4 (emphasis added).

36

Another example given for potential use of the Farese '685 invention is the broadband ISDN network, which would include the transmission of "voice and other delay sensitive traffic ... over circuit switched connections," and in which other traffic "could be routed on a packet basis through packet switched connections established through channels designed to be interfaced to respective local and/or metropolitan area networks." Col. 9:53-64. The specification's discussion of the particular embodiment shown in the figures was "for purposes of illustration and to simplify the following discussion," not to limit the applicable scope of the '685 teachings. Col. 9:65-68. Notably, the claims of the Farese '685 patent themselves are not limited to the ISDN but they too specifically teach and suggest the applicability of the change-over to other types of communications connections. *See, e.g.*, Farese '685 Claim 10 at Col. 36:31-58.

### E.     Lucent Technologies Press Release, Exhibit 6

Exhibit 6 is a press release published by Lucent Technologies on September 17, 1996, and it is prior art to the '453 patent under 35 U.S.C. § 102(a). In the press release, Lucent announced new "Internet telephony servers," through which customers "will be able to choose to route their fax and voice traffic through the Internet for cost savings, or through public or private networks for quality, reliability and security." Calls could thus be routed through the packet-switched Internet, or through line-switched private networks, such as the PSTN.

The Lucent press release also describes how the "Internet telephony server will use industry standard connections, allowing multi-site, multi-vendor networks using any business telephone system. ... The Internet telephony server routes fax and voice traffic from traditional telecommunications network to business intranets and the Internet."[13] "Any" existing telephone equipment would be useable with the server, thus including analog, digital and IP telephones.

---

[13] Various references described and made known to the art in general outline the overall operations of carrying out voice telephone calls over the internet. *See, e.g.*, White, U.S. Patent No. 6,069,890 (Exhibit 3) and Farris,

LJBA/1826077.1

The press release also discloses the ability to change-over from a packet switched telephone connection to a circuit switched connection in the middle of a call, for example, to avoid congestion that could affect the quality of calls on the Internet: "Eventually, the network management software will be able to transparently route traffic over either intra/Internet or the public network. If the Internet was too congested, for instance, the server could switch the transmission back to the public network." This passage also highlights the ability of the server to monitor a transmission that was originally sent over the Internet and switch "the transmission" -- i.e., the individual communications connection -- back to the public switched network at the direction of the network management software in the server.

## VI. STATEMENT POINTING OUT EACH SUBSTANTIAL NEW QUESTION OF PATENTABILITY

As will be fully explained and supported below, based on a series of prior art patents that includes art not previously considered or discussed by the Patent Office, it was well known in the art at the time of Schindler et al.'s purported invention that a line-switched connection could be used as an alternative or bypass for the transmission of telephone calls or other data over a packet-switched network, and that the change-over from a packet-switching transmission to a line-switching transmission could be done in response to a control signal, during an existing call, without interruption of the connection or a call set-up procedure. Not only had the problems of packet-switching transmissions been recognized, but it had also been realized that the establishment of a new connection over a line-switched network for alternate transmission of the data was an obvious solution to the problems. Specific technical solutions for creating a bypass line and causing a change-over of the communication had also been identified and disclosed in

---

U.S. Patent No. 6,125,113 (Exhibit 26). The Schindler '453 patent does not purport to have invented Internet telephony or the manner of enabling telephone calls to be carried over packet switching networks such as the packet-switch portion of the ISDN or other packet networks such as ATM or frame relay networks.

38

the prior art, including essentially identical structures of switches for performing the change-over.

Accordingly, Requestor respectfully requests that the Examiner issue a rejection of each of the challenged claims of the '453 patent as unpatentable under 35 U.S.C. § 102 and § 103 in view of the prior art references provided herewith. The statutory presumption of validity under 35 U.S.C. § 282 has no application in reexamination. *See* MPEP § 2258 G (citing *In re Etter*, 756 F.2d 852 (Fed. Cir. 1985)). During reexamination, claims are to be given their "broadest reasonable interpretation consistent with the specification and limitations in the specification are not read into the claims." *See* MPEP § 2258 G, citing *In re Yamamoto*, 740 F.2d 1569 (Fed. Cir. 1984). Therefore, a substantial new question of patentability is raised by these references.

More specifically, Requestor identifies the following proposed rejections and substantial new questions of patentability (SNQ) and states how each SNQ is raised. A Detailed Explanation for each SNQ is provided in the claim charts later in this Request.

1.    Claims 34, 35, 36 and 38 of the '453 patent are anticipated under 35 U.S.C. § 102(e) by U.S. Patent No. 5,610,910 (Focsaneanu '910). A substantial new question of patentability as to Claims 34, 35, 36 and 38 of the '453 patent is raised by Focsaneanu '910, as Focsaneanu '910 teaches all the limitations of these claims. Focsaneanu '910 was cited in an information disclosure statement during the prior examination of the patent under reexamination, but was never discussed or applied in a rejection, and it does not appear to have been considered with respect to the challenged claims. For the reasons stated in the text below and in the claim charts, a reasonable examiner would consider the teachings of Focsaneanu '910 important in determining whether or not the claims are patentable.

39

2.      Claims 34, 36 and 38 of the '453 patent are anticipated under 35 U.S.C. § 102(e) by U.S. Patent No. 6,069,890 (White '890). A substantial new question of patentability as to Claims 34, 36 and 38 of the '453 patent is raised by White '890, as White '890 teaches all the limitations of these claims, if White is construed as Teles has construed it in the pending lawsuit. White '890 was not cited or discussed during the prior examination of the patent under reexamination, and accordingly was never applied in a rejection. For the reasons stated in the text below and in the claim charts, a reasonable examiner would consider the teachings of White '890 important in determining whether or not the claims are patentable.

3.      Claims 34, 35, 36 and 38 of the '453 patent are unpatentable under 35 U.S.C. § 103(a) as being obvious over Focsaneanu '910 in view of Jonas '792, and further in view of Lucent. A substantial new question of patentability as to Claims 34, 35, 36 and 38 of the '453 patent is raised by Focsaneanu '910, in view of Jonas '792 and further in view of Lucent. The combination of Focsaneanu '910, in view of Jonas '792 and in further view of Lucent, contains a teaching of all the limitations of the challenged claims. Focsaneanu '910 was cited in an information disclosure statement during the prior examination of the patent under reexamination, but was never discussed or applied in a rejection. Jonas '792 was cited and discussed during the prior examination. Lucent is a new reference that was not cited or discussed during the examination. The combination of Focsaneanu '910 and Jonas '792 was not discussed or applied in a rejection, and the combination was also not considered in further view of the teachings of Lucent. For the reasons stated in the text below and in the claim charts, a reasonable examiner would consider the teachings of Focsaneanu '910 in view of Jonas '792, and further in view of Lucent, important in determining whether or not the claims are patentable.

LIBA/1826077.1

4.      Claims 34, 35, 36 and 38 of the '453 patent are unpatentable under 35 U.S.C. §
103(a) as being obvious over Focsaneanu '910 in view of Farese '685, and further in view of
Lucent.  A substantial new question of patentability as to Claims 34, 35, 36 and 38 of the '453
patent is raised by Focsaneanu '910, in view of Farese '685 and further in view of Lucent.  The
combination of Focsaneanu '910, in view of Farese '685 and in further view of Lucent, contains
a teaching of all the limitations of the challenged claims.  Focsaneanu '910 was cited in an
information disclosure statement during the prior examination of the patent under reexamination,
but was never discussed or applied in a rejection.  Farese '685 was cited in the '453 specification
(and mischaracterized by the applicant, as discussed below), but not cited by the Examiner or
discussed during the prior examination.  Lucent is a new reference that was not cited or
discussed during the examination.  The combination of Focsaneanu '910 and Farese '685 was
not discussed or applied in a rejection, and the combination was also not considered in further
view of the teachings of Lucent.  For the reasons stated in the text below and in the claim charts,
a reasonable examiner would consider the teachings of Focsaneanu '910 in view of Farese '685,
and further in view of Lucent, important in determining whether or not the claims are patentable.

5.      Claims 34, 35, 36 and 38 of the '453 patent are unpatentable under 35 U.S.C. §
103(a) as being obvious over White '890 in view of Jonas '792, and further in view of Lucent.
A substantial new question of patentability as to Claims 34, 35, 36 and 38 of the '453 patent is
raised by White '890, in view of Jonas '792 and further in view of Lucent.  The combination of
White '890, in view of Jonas '792 and in further view of Lucent, contains a teaching of all the
limitations of the challenged claims.  White '890 and Lucent are new references that were not
cited or discussed during the examination.  Jonas '792 was cited and discussed during the prior
examination and applied in a rejection.  The combination of White '890 and Jonas '792 was not

41

discussed or applied in a rejection, and the combination was also not considered in further view of the teachings of Lucent. For the reasons stated in the text below and in the claim charts, a reasonable examiner would consider the teachings of White '890 in view of Jonas '792, and further in view of Lucent, important in determining whether or not the claims are patentable.

6.    Claims 34, 35, 36 and 38 of the '453 patent are unpatentable under 35 U.S.C. § 103(a) as being obvious over White '890 in view of Farese '685, and further in view of Lucent. A substantial new question of patentability as to Claims 34, 35, 36 and 38 of the '453 patent is raised by White '890, in view of Farese '685, and further in view of Lucent. The combination of White '890, in view of Farese '685 and in further view of Lucent, contains a teaching of all the limitations of the challenged claims. White '890 and Lucent are new references that were not cited or discussed during the examination. Farese '685 was cited in the '453 specification (and mischaracterized by the applicant, as discussed below), but not cited by the Examiner or discussed during the prior examination. The combination of White '890 and Farese '685 was not discussed or applied in a rejection, and the combination was also not considered in further view of the teachings of Lucent. For the reasons stated in the text below and in the claim charts, a reasonable examiner would consider the teachings of White '890 in view of Farese '685, and further in view of Lucent, important in determining whether or not the claims are patentable.

As noted above, only one of these references (Jonas '792) was discussed by the Examiner in the '453 patent prosecution. Neither White '890 nor Lucent was cited or reviewed by the Examiner. The Focsaneanu '910 reference was cited but not discussed or apparently considered in detail by the Examiner, either alone or in combination. Even though some of the art cited below was considered by the Examiner, a substantial new question of patentability exists where, as here, art previously cited or considered "is being presented/viewed in a new light, or in a

42

different way, as compared with its use in the earlier concluded examination(s), in view of a material new argument or interpretation presented in the request." MPEP § 2242 II(A). "The existence of a substantial new question of patentability is not precluded by the fact that the patent or printed publication was previously cited by or to the Office or considered by the Office." 35 U.S.C. § 312(a).[14]

Moreover, the recent decision by the United States Supreme Court in *KSR Int'l Co. v. Teleflex, Inc.*, 127 S.Ct. 1727 (2007), has altered the obviousness standard applied in situations such as that presented by the '453 patent. Casting aside a rigid "teaching, suggestion, motivation-to-combine" test for obviousness, the Supreme Court warned against granting of a patent that is no more than "the predictable use of prior art elements according to their established functions." *KSR*, 127 S.Ct. at 1740. This sea change in the obviousness analysis raises additional questions of patentability especially here where the patentee admits that "[t]he technologies used are known per se" and is simply claiming the combination of known elements and techniques that produce a predictable result. '453 patent at Col. 6:46.[15]

## VII.  DETAILED EXPLANATION OF PERTINENCE AND MANNER OF APPLYING CITED PRIOR ART TO EVERY CLAIM FOR WHICH REEXAMINATION IS REQUESTED

### A.    Anticipation Of The Claims By The Prior Art

Invalidity based on a lack of novelty ("anticipation") requires that the same invention, including each element and limitation of the claims, was known or used by others before it was invented by the patentee. *See Nystrom v. Trex Co., Inc.*, 374 F.3d 1105 (Fed. Cir. 2004).

---

[14]    "It is only necessary to establish that a substantial new question of patentability exists as to any one of the patent claims in order to order reexamination. In the examination stage of the reexamination, normally all patent claims will be reexamined, even where the order has made a finding of a substantial new question for less than all of the patent claims." MPEP § 2240 at 2200-46 (8th ed., rev. 2) (May 2004).

[15]    A detailed analysis of the obviousness issue is included below in Section H.2.

43

Novelty of a claim is judged by a simple comparison of the literal language of the scrutinized claim with a single piece of prior art. *See Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1120 (Fed. Cir. 2002). A claim lacks novelty, and is thus not valid under 35 U.S.C. § 102, if every feature of that claim is found, either expressly or under principles of inherency, in a single prior art reference or document. *See Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571 (Fed. Cir. 1995); *Dayco Prods. v. Total Containment, Inc.*, 329 F.3d 1358 (Fed. Cir. 2003).

A reference anticipates a claim if it discloses the claimed invention "such that a skilled artisan could take its teachings in *combination with his own knowledge of the particular art and be in possession of the invention*." *See In re Graves*, 69 F.3d 1147, 1152 (Fed. Cir. 1995) (citing *In re LeGrice*, 301 F.2d 929, 936 (CCPA 1962); *In re Donohue*, 766 F.2d 531, 533 (Fed. Cir. 1985)).[16] Extrinsic evidence may be used to explain the meaning that a reference would have had to one skilled in the art. *In re Baxter Travenol Labs.*, 952 F.2d 388, 390-91 (Fed. Cir. 1991).

Even where a reference does not disclose in words all the elements of a claim, it may be anticipating if a person of ordinary skill in the art would understand the reference as disclosing those elements, and if such a person could have combined the reference's teaching with his own knowledge to make the claimed invention. *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1347 (Fed. Cir. 2000); *Continental Can Co. U.S.A. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991) ("To serve as an anticipation when the reference is silent about the asserted inherent characteristic, such gap in the reference may be filled with recourse to extrinsic evidence."). This principle of filling the "gap" by showing inherent properties of an anticipating reference

---

[16] Anticipation requires just a single, complete disclosure of the invention in the reference. If one complete example anticipates, the disclosure need not draw attention to or agree with the anticipating example. *See Medichem, S.A. v. Rolabo, S.L.*, 353 F.3d 928, 934 (Fed. Cir. 2003) (citing *Titanium Metals Corp. v. Banner*, 778 F.2d 775, 782 (Fed. Cir. 1985) (one graph data point out of fifteen from the prior art reads on the claims at issue, thereby anticipating them)).

LIBA/1826077.1

through extrinsic evidence also does not offend the requirement that reexamination be based on patents or printed publications. "Affidavits or declarations which explain the contents or pertinent dates of prior patents or printed publications in more detail may be considered in reexamination…." *See* MPEP § 2258.

Details of the anticipation of the various claims by each of the references is provided in the following charts, on a claim-by-claim basis. More particularly, Requestor submits that at least the following rejections are fully supported:

-- Claims 34, 35, 36 and 38 are anticipated under 35 U.S.C. § 102(e) by Focsaneanu '910 (Exhibit 2); and

-- Claims 34, 36 and 38 are anticipated under 35 U.S.C. § 102(e) by White '890 (Exhibit 3), if the claims are construed as asserted by Teles in the ongoing litigation.

B.    **Obviousness In View Of The Prior Art – Overview**

1.    **The Law of Obviousness**

Recent decisions by the United States Supreme Court, the Federal Circuit, and the Board of Patent Appeals and Interferences have reviewed and strengthened the standards for determining when a claimed invention is invalid as obvious. The Board's decision in *Ex Parte Catan*, 2007 WL 1934867 at *4 (July 3, 2007), quotes the Supreme Court's decision in *KSR Int'l Co. v. Teleflex, Inc.*, 127 S.Ct. 1727, 1734 (2007), as reaffirming that "Section 103 forbids issuance of a patent when 'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art....'" *See also* 35 U.S.C. § 103(a) (1994); *Graham v. John Deere Co.*, 383 U.S. 1, 13 (1966).[17]   The ultimate determination of whether an invention is or is not obvious is a legal conclusion based on underlying factual inquiries including: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness. *See Graham*, 383 U.S. at 17-18; *see also Miles Labs., Inc. v. Shandon Inc.*, 997 F.2d 870, 877 (Fed. Cir. 1993). As acknowledged in *Ex Parte Catan*, the Supreme Court emphasized in *KSR* "the need for caution in granting a patent based on the combination of elements found in the prior art." *Ex Parte Catan*, 2007 WL 1934867 at *5

---

[17]    Similar conclusions were reached by the Board in *Ex parte Smith*, 2007 WL 1813761 (June 25, 2007), which also upheld the Examiner's final rejection of proposed claims on obviousness grounds.

62

(quoting *KSR*, 127 S.Ct. at 1739). The Supreme Court also stated that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 127 S.Ct. at 1739. The Court explained:

> "When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, §103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* at 1740.

As the Board stated in *Ex Parte Catan*, "[t]he operative question in this 'functional approach' is thus 'whether the improvement is more than the predictable use of prior art elements according to their established functions.'" *Ex parte Catan*, 2007 WL 1934867 at *5 (quoting *KSR*, 127 S.Ct. at 1740). While a rejection on obviousness grounds must have an articulated reasoning with some rational underpinning, the "analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* (quoting *KSR*, 127 S.Ct. at 1741).[18]

While the Supreme Court did recognize in *KSR* that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does[,]" the Supreme Court immediately cautioned that "[h]elpful insights, however, need not become rigid and mandatory formulas. . . ."

---

[18]   The Board in *Ex Parte Catan* also cited the Federal Circuit's recent decision in *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161 (Fed. Cir. 2007), as an example of the application of Section 103. *See Ex parte Catan*, 2007 WL 1934867 at *6. The Federal Circuit in that case concluded that it would have been obvious to combine (1) a mechanical device for actuating a phonograph to play back sounds associated with a letter in a word on a puzzle piece with (2) an electronic, processor-driven device capable of playing the sound associated with a first letter of a word in a book. *Leapfrog*, 485 F.3d at 1161.

LIBA/1826077.1

*KSR*, 127 S.Ct. at 1741. The Supreme Court went on to clarify that the motivation for the combination does not have to be expressly stated in the cited prior art in order for a combination to be found obvious: "As our precedents make clear, however, the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* at 1741. "Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 1742. Furthermore, the Court also stated, in a passage directly applicable here: "One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims." *Id.*

In *Ex Parte Catan*, the Board went on to apply these standards to find a claimed invention obvious based on the combination of prior art. Again, the Board cited *KSR*: "Where, as here '[an application] claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result.'" *Id.* at *9 (quoting *KSR*, 127 S.Ct. at 1740). Likewise, in the case of *Ex Parte Smith*, 2007 WL 1813761 at *11 (June 25, 2007), the Board upheld the Examiner's final rejection of claims on the ground that the proposed claims "were combinations which only unite old elements with no change in their respective functions and which yield predictable results."

### 2. Obviousness of the '453 Claims in this Case and the Motivation to Combine

Here, to the extent that the anticipatory references cited above fail to disclose any particular limitation of the various claims, the claims are nonetheless obvious under Section 103

because all of the limitations of the claimed inventions were disclosed in one or more of the other references and it would have been readily within the skill of the person of ordinary skill in this art to unite the various elements to obtain the predictable results from the combination. Indeed, as noted above, even the patentee acknowledges in the specification that "[t]he technologies used are known per se." '453 patent at Col. 6:46. Notably, the patentee never claimed as novel the various features of packet or line switching, of the ISDN, of the Internet, of Internet telephony, or of the end terminal telecommunications devices (e.g., ISDN or analog telephones) that are used and depicted in the patent as being part of well known packet and line switching networks. Even the structure of the "switch according to the invention" shown in Figure 4 of the '453 patent, and claimed in the "means plus function" elements of Claim 34, is admitted by the '453 inventors to be a combination of known switch elements. *See, e.g.*, Col. 8:35-52. Those switch elements enabling a single telephone call from an analog phone to be routed over the Internet or over the PSTN are found in the prior art, for example, in Focsaneanu '910 (at Figs. 8 and 14), and in White '890 (at Fig. 2).

The motivation to make the proposed combinations to obtain the claimed invention is clearly present in the art as well. As noted in the Overview above and in the discussion of the various prior art references, the reasons for causing a packet-switched communication to change over to line switching during an ongoing connection were cited in various references, and they applied equally to the attempt to route telephone calls over the Internet or over the PSTN. The '453 patent cites as reasons for the need for a "dynamic" changeover the fact that "[l]ine-switching connections are expensive" (Col. 1:44) and that packet-switching over the Internet is subject to "delays [that] are of considerable significance" (Col. 2:7) due to congestion and

65

blockages. The '453 invention supposedly provides "flexible data transfer between the switches and more particularly cost-effective data transfer with real time properties." Col. 3:12-14.

Precisely these motivations were at issue in the prior art references cited in this reexamination request. The Focsaneanu '910 patent and the Lucent Press Release, for example, specifically mention these factors as motivating their own teachings of a dynamic change-over that changes a telephone call initially made through the Internet to a call over a bypass line-switched connection on the PSTN. *See, e.g.,* Focsaneanu '910 patent at Col. 11:7-16 & 14:13-20; Lucent at 2 ("If the Internet was too congested, for instance, the server could switch the transmission back to the public network."). The Jonas '792 patent's teaching of the creation of a bypass line-switched connection as a back-up for an ongoing packet switched connection over the Internet was also explicitly motivated by concerns over potential delays in the Internet. *See, e.g.,* Jonas '792 at Col. 3:3-20 & 5:53-6:3. Farese '685, as well, describes the same factors and motivations in applying change-over switching in the then-emerging technology of ISDN and broadband ISDN. *See, e.g.,* Farese '685 at Col. 2:4-2:32.[19]

Indeed, the Farese '685 patent not only identifies the common motivation for making the change-over between packet and line switching, but also specifically spells out that the dynamic change-over described there could readily be applied to *other* networks that have "two or more

---

[19] "Due to the substantial differences between the two different types of ISDN connections, circuit switched and packet switched connections each provide different advantages and drawbacks. First, a circuit switched connection provides a continuous transmission path from the caller to the called party throughout the duration of a call. Such a connection imparts relatively little, if any, transmission delay to any communication carried over the path. Therefore, circuit switched connections are used in those communication applications, such as illustratively conversational voice traffic or highly interactive data traffic, where any appreciable transmission delay can not be tolerated. Second, circuit switched connections provide higher throughput than do many packet switched networks, such as specifically X.25 type packet switched networks. As such, communications applications that require a high throughput and low delay transmission path, such as illustratively real-time transfer of large files or transfer of high density digitized images, are ideal for transport over circuit switched connections. Unfortunately, since only one call, at least from the standpoint of a local switch and apart from any user multiplexing, can be carried over a given circuit switched connection through the network from a caller to a called party, use of a circuit switched connection tends to be quite expensive particularly if the connection is to be maintained over a prolonged period of time." Farese '685 at Col. 2:4-32.

LIBA/1826077.1

separate communication connections that have different attributes, such as illustratively throughput, transport delay or cost of use." Farese '685 at Col. 9:35-43. This passage and others from the art references themselves provide specific motivation to expand the teachings of the individual references, if necessary, to the particular context and features claimed in the '453 patent. What Schindler et al., now claim to have invented, in fact was previously invented and well known and disclosed in the art.[20]

During the prosecution of the '453 patent, Applicant attempted to distinguish Jonas '792 and Arango '078 on the ground that they did not disclose telephones (but only computers) as end stations, and thus did not disclose telephone calls comprising non-packetized data. But as noted in the Overview above, the White '890 patent demonstrates just how well known it was that Internet telephone calls could be placed using a variety of different end terminal equipment, including from analog POTS phones. Not only that, but White specifically points out that it was known in the art that computer terminals (such as those disclosed in the Jonas '792 and Farese '685 references) could be used to generate telephone calls comprising non-packetized data that could be routed over the Internet. *See, e.g.,* White '890 at Col. 2:43-57 ("One or more companies have recently developed software for use on personal computers to permit two-way transfer of real-time voice information via an Internet data link between two personal computers. In one of the directions, the sending computer converts voice signals from analog to digital format...."). A person of skill in the art would have readily understood that the data

---

[20] Other references in the art, although not relied upon in this reexamination, also identified similar motivations to make a mid-call change over from packet to line switching. For example, the Arango '078 reference (Exhibit 13), cited to the Patent Office during the original prosecution, teaches a mid-call changeover from packet switching to line switching, and cites the same motivation for its teaching. *See* Arango '078 at Col. 3:23-31, 3:48-51 ("the Internet 100 does not provide any mechanism to the hosts h1-h10 for controlling or predicting the end-to-end time interval for completing the communication.... At times of high congestion ... packets will be buffered for longer periods of time and incur high delays.... This presents a problem for 'time-sensitive' communications, such as text, audio, video etc.").

LIBA/1826077.1

transmissions from the computer end terminals of Jonas '792 and Farese '685 could encompass voice telephone transmissions, and would have understood that the benefits from a "change-over" identified in those references would apply equally to telephone calls.

Finally, as noted earlier, the prosecution history of the '453 patent and its parent application are notable for the lack of discussion of potential obviousness combinations. None of the various combinations proposed here appear to have been considered by the Patent Office. The kind of analysis required by the Board and used by the Supreme Court and Federal Circuit in recent decisions should be applied here to find the '453 claims obvious.

Details of the obviousness of the various claims by each of the combination of references is provided in the charts provided below, on a claim-by-claim basis.

## VIII.   CERTIFICATION OF SERVICE ON PATENTEE

It is certified that a copy of this *Ex Parte* Reexamination Request has been served in its entirety on the patent owner as provided in 37 C.F.R. § 1.33(c) on August 28, 2007.  The name and address of the party served is as follows:  Vincent M. DeLuca and Richard C. Auchtertonie, Novak, Druce & Quigg LLP, 1300 Eye Street, N.W., Suite 1000 West Tower, Washington, D.C. 20005,  A courtesy copy is being sent to Matthew J. Moore, Howrey LLP, 1299 Pennsylvania Ave., N.W., Washington, D.C. 20004.

## IX.   STATEMENT IDENTIFYING THE REAL PARTY IN INTEREST

The real party in interest is the Requestor, Cisco Systems, Inc., a Delaware corporation.

## X.   REQUESTOR'S CORRESPONDENCE ADDRESS

Direct all communications in this matter to the Requestor at the following address: Byron Cooper, Goodwin Procter LLP, Exchange Place, Boston, MA 02109.

171

LIBA/1826077.1

## XI.  CONCLUSION

Substantial new questions of patentability of claims 34, 35, 36 and 38 of the '453 patent are raised in view of the art cited and discussed above.

Accordingly, the Requestor respectfully submits that reexamination of the Schindler '453 patent is warranted in view of the showing in this Request that substantial new questions of patentability are presented.  Early notice of the grant of this Request is earnestly solicited.

Respectfully submitted,

CISCO SYSTEMS, INC.

Electronic signature:  /Byron Cooper/
Byron Cooper
Registration No. 39,484

Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
Tel: (617) 570-1000
Customer Number 051414

August 30, 2007

LIBA/1826077.1